## BENNETT ET AL. *v.* SPEAR ET AL.

No. 95–813.   Argued November 13, 1996—Decided March 19, 1997

156

*Gregory K. Wilkinson* argued the cause for petitioners. With him on the briefs was *William F. Schroeder.*

*Deputy Solicitor General Kneedler* argued the cause for respondents. With him on the brief were *Acting Solicitor General Dellinger, Assistant Attorney General Schiffer, Malcolm L. Stewart, Anne S. Almy, Robert L. Klarquist,* and *Evelyn S. Ying.**

*Briefs of *amici curiae* urging reversal were filed for the State of California et al. by *Daniel E. Lungren,* Attorney General of California, *Roderick E. Walston,* Chief Assistant Attorney General, *Charles W. Getz IV,* Assistant Attorney General, and *Linus Masouredis,* Deputy Attorney General, and by the Attorneys General for their respective States as follows: *Bruce M. Botelho* of Alaska, *Grant Woods* of Arizona, *Winston Bryant* of Arkansas, *Gale A. Norton* of Colorado, *Margery S. Bronster* of

JUSTICE SCALIA delivered the opinion of the Court.

This is a challenge to a biological opinion issued by the Fish and Wildlife Service in accordance with the Endangered Species Act of 1973 (ESA), 87 Stat. 884, as amended, 16 U. S. C. § 1531 *et seq.*, concerning the operation of the Klamath Irrigation Project by the Bureau of Reclamation, and the project's impact on two varieties of endangered fish. The question for decision is whether the petitioners, who have competing economic and other interests in Klamath Project water, have standing to seek judicial review of the biological opinion under the citizen-suit provision of the ESA, § 1540(g)(1), and the Administrative Procedure Act (APA), 80 Stat. 392, as amended, 5 U. S. C. § 701 *et seq.*

I

The ESA requires the Secretary of the Interior to promulgate regulations listing those species of animals that are "threatened" or "endangered" under specified criteria, and

Hawaii, *Alan G. Lance* of Idaho, *Carla J. Stovall* of Kansas, *Jeremiah W. Nixon* of Missouri, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Betty D. Montgomery* of Ohio, *Jan Graham* of Utah, and *Darrell V. McGraw, Jr.,* of West Virginia; for the State of Texas by *Dan Morales,* Attorney General, *Jorge Vega,* First Assistant Attorney General, and *Javier P. Guajardo* and *Sam Goodhope,* Special Assistant Attorneys General; for the American Farm Bureau Federation et al. by *Timothy S. Bishop, Michael F. Rosenblum, John J. Rademacher, Richard L. Krause,* and *Nancy N. McDonough;* for the American Forest & Paper Association et al. by *Steven P. Quarles, Clifton S. Elgarten, Thomas R. Lundquist,* and *William R. Murray;* for the American Homeowners Foundation et al. by *Nancie G. Marzulla;* for the Association of California Water Agencies et al. by *Thomas W. Birmingham, Clifford W. Schulz, Janet K. Goldsmith,* and *William T. Chisum;* for the National Association of Home Builders of the United States et al. by *Glen Franklin Koontz, Thomas C. Jackson,* and *Nick Cammarota;* for the Nationwide Public Projects Coalition et al. by *Lawrence R. Liebesman* and *Kenneth S. Kamlet;* for the Pacific Legal Foundation et al. by *Robin L. Rivett* and *M. Reed Hopper;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo, Paul D. Kamenar,* and *Craig S. Harrison.*

158

to designate their "critical habitat." 16 U. S. C. § 1533. The ESA further requires each federal agency to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical." § 1536(a)(2). If an agency determines that action it proposes to take may adversely affect a listed species, it must engage in formal consultation with the Fish and Wildlife Service, as delegate of the Secretary, *ibid.;* 50 CFR § 402.14 (1995), after which the Service must provide the agency with a written statement (the Biological Opinion) explaining how the proposed action will affect the species or its habitat, 16 U. S. C. § 1536(b)(3)(A). If the Service concludes that the proposed action will "jeopardize the continued existence of any [listed] species or threatened species or result in the destruction or adverse modification of [critical habitat]," § 1536(a)(2), the Biological Opinion must outline any "reasonable and prudent alternatives" that the Service believes will avoid that consequence, § 1536(b)(3)(A). Additionally, if the Biological Opinion concludes that the agency action will not result in jeopardy or adverse habitat modification, or if it offers reasonable and prudent alternatives to avoid that consequence, the Service must provide the agency with a written statement (known as the Incidental Take Statement) specifying the "impact of such incidental taking on the species," any "reasonable and prudent measures that the [Service] considers necessary or appropriate to minimize such impact," and setting forth "the terms and conditions . . . that must be complied with by the Federal agency . . . to implement [those measures]." § 1536(b)(4).

The Klamath Project, one of the oldest federal reclamation schemes, is a series of lakes, rivers, dams, and irrigation canals in northern California and southern Oregon. The project was undertaken by the Secretary of the Interior

pursuant to the Reclamation Act of 1902, 32 Stat. 388, as amended, 43 U. S. C. § 371 *et seq.*, and the Act of Feb. 9, 1905, 33 Stat. 714, and is administered by the Bureau of Reclamation, which is under the Secretary's jurisdiction. In 1992, the Bureau notified the Service that operation of the project might affect the Lost River Sucker *(Deltistes luxatus)* and Shortnose Sucker *(Chasmistes brevirostris)*, species of fish that were listed as endangered in 1988, see 53 Fed. Reg. 27130–27133 (1988). After formal consultation with the Bureau in accordance with 50 CFR § 402.14 (1995), the Service issued a Biological Opinion which concluded that the " 'long-term operation of the Klamath Project was likely to jeopardize the continued existence of the Lost River and shortnose suckers.' " App. to Pet. for Cert. 3. The Biological Opinion identified "reasonable and prudent alternatives" the Service believed would avoid jeopardy, which included the maintenance of minimum water levels on Clear Lake and Gerber reservoirs. The Bureau later notified the Service that it intended to operate the project in compliance with the Biological Opinion.

Petitioners, two Oregon irrigation districts that receive Klamath Project water and the operators of two ranches within those districts, filed the present action against the director and regional director of the Service and the Secretary of the Interior. Neither the Bureau nor any of its officials is named as defendant. The complaint asserts that the Bureau "has been following essentially the same procedures for storing and releasing water from Clear Lake and Gerber reservoirs throughout the twentieth century," *id.*, at 36; that "[t]here is no scientifically or commercially available evidence indicating that the populations of endangered suckers in Clear Lake and Gerber reservoirs have declined, are declining, or will decline as a result" of the Bureau's operation of the Klamath Project, *id.*, at 37; that "[t]here is no commercially or scientifically available evidence indicating that the restrictions on lake levels imposed in the Biological Opinion

will have any beneficial effect on the . . . populations of suckers in Clear Lake and Gerber reservoirs," *id.*, at 39; and that the Bureau nonetheless "will abide by the restrictions imposed by the Biological Opinion," *id.*, at 32.

Petitioners' complaint included three claims for relief that are relevant here. The first and second claims allege that the Service's jeopardy determination with respect to Clear Lake and Gerber reservoirs, and the ensuing imposition of minimum water levels, violated § 7 of the ESA, 16 U. S. C. § 1536. The third claim is that the imposition of minimum water elevations constituted an implicit determination of critical habitat for the suckers, which violated § 4 of the ESA, 16 U. S. C. § 1533(b)(2), because it failed to take into consideration the designation's economic impact.[1] Each of the claims also states that the relevant action violated the APA's prohibition of agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U. S. C. § 706(2)(A).

The complaint asserts that petitioners' use of the reservoirs and related waterways for "recreational, aesthetic and commercial purposes, as well as for their primary sources of irrigation water," will be "irreparably damaged" by the actions complained of, App. to Pet. for Cert. 34, and that the restrictions on water delivery "recommended" by the Biological Opinion "adversely affect plaintiffs by substantially reducing the quantity of available irrigation water," *id.*, at 40. In essence, petitioners claim a competing interest in the water the Biological Opinion declares necessary for the preservation of the suckers.

The District Court dismissed the complaint for lack of jurisdiction. It concluded that petitioners did not have

---

[1] Petitioners also raised a fourth claim: that the *de facto* designation of critical habitat violated the National Environmental Policy Act of 1969, 83 Stat. 853, as amended, 42 U. S. C. § 4332(2)(C), because it was not preceded by preparation of an environmental assessment. The Court of Appeals' dismissal of that claim has not been challenged.

standing because their "recreational, aesthetic, and commercial interests . . . do not fall within the zone of interests sought to be protected by ESA." *Id.*, at 28. The Court of Appeals for the Ninth Circuit affirmed. *Bennett* v. *Plenert*, 63 F. 3d 915 (1995). It held that the "zone of interests" test limits the class of persons who may obtain judicial review not only under the APA, but also under the citizen-suit provision of the ESA, 16 U. S. C. § 1540(g), and that "only plaintiffs who allege an interest in the *preservation* of endangered species fall within the zone of interests protected by the ESA," 63 F. 3d, at 919 (emphasis in original). We granted certiorari. 517 U. S. 1102 (1996).

In this Court, petitioners raise two questions: first, whether the prudential standing rule known as the "zone of interests" test applies to claims brought under the citizen-suit provision of the ESA; and second, if so, whether petitioners have standing under that test notwithstanding that the interests they seek to vindicate are economic rather than environmental. In this Court, the Government has made no effort to defend the reasoning of the Court of Appeals. Instead, it advances three alternative grounds for affirmance: (1) that petitioners fail to meet the standing requirements imposed by Article III of the Constitution; (2) that the ESA's citizen-suit provision does not authorize judicial review of the types of claims advanced by petitioners; and (3) that judicial review is unavailable under the APA because the Biological Opinion does not constitute final agency action.

## II

We first turn to the question the Court of Appeals found dispositive: whether petitioners lack standing by virtue of the zone-of-interests test. Although petitioners contend that their claims lie both under the ESA and the APA, we look first at the ESA because it may permit petitioners to recover their litigation costs, see 16 U. S. C. § 1540(g)(4), and because the APA by its terms independently authorizes re-

view only when "there is no other adequate remedy in a court," 5 U. S. C. § 704.

The question of standing "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth* v. *Seldin,* 422 U. S. 490, 498 (1975) (citing *Barrows* v. *Jackson,* 346 U. S. 249 (1953)). To satisfy the "case" or "controversy" requirement of Article III, which is the "irreducible constitutional minimum" of standing, a plaintiff must, generally speaking, demonstrate that he has suffered "injury in fact," that the injury is "fairly traceable" to the actions of the defendant, and that the injury will likely be redressed by a favorable decision. *Lujan* v. *Defenders of Wildlife,* 504 U. S. 555, 560–561 (1992); *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.,* 454 U. S. 464, 471–472 (1982). In addition to the immutable requirements of Article III, "the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." *Id.,* at 474–475. Like their constitutional counterparts, these "judicially self-imposed limits on the exercise of federal jurisdiction," *Allen* v. *Wright,* 468 U. S. 737, 751 (1984), are "founded in concern about the proper—and properly limited—role of the courts in a democratic society," *Warth, supra,* at 498; but unlike their constitutional counterparts, they can be modified or abrogated by Congress, see 422 U. S., at 501. Numbered among these prudential requirements is the doctrine of particular concern in this case: that a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit. See *Allen, supra,* at 751; *Valley Forge, supra,* at 474–475.

The "zone of interests" formulation was first employed in *Association of Data Processing Service Organizations, Inc.* v. *Camp,* 397 U. S. 150 (1970). There, certain data processors sought to invalidate a ruling by the Comptroller of the Currency authorizing national banks to sell data processing

services on the ground that it violated, *inter alia*, § 4 of the Bank Service Corporation Act of 1962, 76 Stat. 1132, which prohibited bank service corporations from engaging in "any activity other than the performance of bank services for banks." The Court of Appeals had held that the banks' data-processing competitors were without standing to challenge the alleged violation of § 4. In reversing, we stated the applicable prudential standing requirement to be "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Data Processing, supra,* at 153. *Data Processing,* and its companion case, *Barlow* v. *Collins,* 397 U. S. 159 (1970), applied the zone-of-interests test to suits under the APA, but later cases have applied it also in suits not involving review of federal administrative action, see *Dennis* v. *Higgins,* 498 U. S. 439, 449 (1991); *Boston Stock Exchange* v. *State Tax Comm'n,* 429 U. S. 318, 320–321, n. 3 (1977); see also Note, A Defense of the "Zone of Interests" Standing Test, 1983 Duke L. J. 447, 455–456, and nn. 40–49 (1983) (cataloging lower court decisions), and have specifically listed it among other prudential standing requirements of general application, see, *e. g., Allen, supra,* at 751; *Valley Forge, supra,* at 474–475. We have made clear, however, that the breadth of the zone of interests varies according to the provisions of law at issue, so that what comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under the "'generous review provisions'" of the APA may not do so for other purposes, *Clarke* v. *Securities Industry Assn.,* 479 U. S. 388, 400, n. 16 (1987) (quoting *Data Processing, supra,* at 156).

Congress legislates against the background of our prudential standing doctrine, which applies unless it is expressly negated. See *Block* v. *Community Nutrition Institute,* 467 U. S. 340, 345–348 (1984). Cf. *Associated Gen. Contractors of Cal., Inc.* v. *Carpenters,* 459 U. S. 519, 532–533, and n. 28

(1983). The first question in the present case is whether the ESA's citizen-suit provision, set forth in pertinent part in the margin,[2] negates the zone-of-interests test (or, perhaps more accurately, expands the zone of interests). We think it does. The first operative portion of the provision says that "any person may commence a civil suit"—an authorization of remarkable breadth when compared with the language Con-

---

[2] "(1) Except as provided in paragraph (2) of this subsection any person may commence a civil suit on his own behalf—

"(A) to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof; or

.            .            .            .

"(C) against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary.

"The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce any such provision or regulation, or to order the Secretary to perform such act or duty, as the case may be. . . .

"(2)(A) No action may be commenced under subparagraph (1)(A) of this section—

"(i) prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation;

"(ii) if the Secretary has commenced action to impose a penalty pursuant to subsection (a) of this section; or

"(iii) if the United States has commenced and is diligently prosecuting a criminal action . . . to redress a violation of any such provision or regulation.

.            .            .            .

"(3)(B) In any such suit under this subsection in which the United States is not a party, the Attorney General, at the request of the Secretary, may intervene on behalf of the United States as a matter of right.

"(4) The court, in issuing any final order in any suit brought pursuant to paragraph (1) of this subsection, may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate." 16 U. S. C. § 1540(g).

gress ordinarily uses. Even in some other environmental statutes, Congress has used more restrictive formulations, such as "[any person] having an interest which is or may be adversely affected," 33 U. S. C. § 1365(g) (Clean Water Act); see also 30 U. S. C. § 1270(a) (Surface Mining Control and Reclamation Act) (same); "[a]ny person suffering legal wrong," 15 U. S. C. § 797(b)(5) (Energy Supply and Environmental Coordination Act); or "any person having a valid legal interest which is or may be adversely affected . . . whenever such action constitutes a case or controversy," 42 U. S. C. § 9124(a) (Ocean Thermal Energy Conversion Act). And in contexts other than the environment, Congress has often been even more restrictive. In statutes concerning unfair trade practices and other commercial matters, for example, it has authorized suit only by "[a]ny person injured in his business or property," 7 U. S. C. § 2305(c); see also 15 U. S. C. § 72 (same), or only by "competitors, customers, or subsequent purchasers," § 298(b).

Our readiness to take the term "any person" at face value is greatly augmented by two interrelated considerations: that the overall subject matter of this legislation is the environment (a matter in which it is common to think all persons have an interest) and that the obvious purpose of the particular provision in question is to encourage enforcement by so-called "private attorneys general"—evidenced by its elimination of the usual amount-in-controversy-and-diversity-of-citizenship requirements, its provision for recovery of the costs of litigation (including even expert witness fees), and its reservation to the Government of a right of first refusal to pursue the action initially and a right to intervene later. Given these factors, we think the conclusion of expanded standing follows *a fortiori* from our decision in *Trafficante* v. *Metropolitan Life Ins. Co.*, 409 U. S. 205 (1972), which held that standing was expanded to the full extent permitted under Article III by § 810(a) of the Civil Rights Act of 1968, 82 Stat. 85, 42 U. S. C. § 3610(a) (1986 ed.), that authorized

"[a]ny person who claims to have been injured by a discriminatory housing practice" to sue for violations of the Act. There also we relied on textual evidence of a statutory scheme to rely on private litigation to ensure compliance with the Act. See 409 U. S., at 210–211. The statutory language here is even clearer, and the subject of the legislation makes the intent to permit enforcement by everyman even more plausible.

It is true that the plaintiffs here are seeking to prevent application of environmental restrictions rather than to implement them. But the "any person" formulation applies to all the causes of action authorized by § 1540(g)—not only to actions against private violators of environmental restrictions, and not only to actions against the Secretary asserting underenforcment under § 1533, but also to actions against the Secretary asserting overenforcement under § 1533. As we shall discuss below, the citizen-suit provision does favor environmentalists in that it covers all private violations of the ESA but not all failures of the Secretary to meet his administrative responsibilities; but there is no textual basis for saying that its expansion of standing requirements applies to environmentalists alone. The Court of Appeals therefore erred in concluding that petitioners lacked standing under the zone-of-interests test to bring their claims under the ESA's citizen-suit provision.

## III

The Government advances several alternative grounds upon which it contends we may affirm the dismissal of petitioners' suit. Because the District Court and the Court of Appeals found the zone-of-interests ground to be dispositive, these alternative grounds were not reached below. A respondent is entitled, however, to defend the judgment on any ground supported by the record, see *Ponte* v. *Real,* 471 U. S. 491, 500 (1985); *Matsushita Elec. Industrial Co.* v. *Epstein,* 516 U. S. 367, 379, n. 5 (1996). The asserted grounds were

raised below, and have been fully briefed and argued here; we deem it an appropriate exercise of our discretion to consider them now rather than leave them for disposition on remand.

## A

The Government's first contention is that petitioners' complaint fails to satisfy the standing requirements imposed by the "case" or "controversy" provision of Article III. This "irreducible constitutional minimum" of standing requires: (1) that the plaintiff have suffered an "injury in fact"—an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Defenders of Wildlife*, 504 U. S., at 560–561.

Petitioners allege, among other things, that they currently receive irrigation water from Clear Lake, that the Bureau "will abide by the restrictions imposed by the Biological Opinion," App. to Pet. for Cert. 32, and that "[t]he restrictions on lake levels imposed in the Biological Opinion adversely affect [petitioners] by substantially reducing the quantity of available irrigation water," *id.*, at 40. The Government contends, first, that these allegations fail to satisfy the "injury in fact" element of Article III standing because they demonstrate only a diminution in the *aggregate* amount of available water, and do not necessarily establish (absent information concerning the Bureau's water allocation practices) that *petitioners* will receive less water. This contention overlooks, however, the proposition that each element of Article III standing "must be supported in the same way as any other matter on which the plaintiff bears the burden

of proof, *i. e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Defenders of Wildlife, supra,* at 561. Thus, while a plaintiff must "set forth" by affidavit or other evidence "specific facts" to survive a motion for summary judgment, Fed. Rule Civ. Proc. 56(e), and must ultimately support any contested facts with evidence adduced at trial, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Defenders of Wildlife, supra,* at 561 (quoting *Lujan* v. *National Wildlife Federation,* 497 U. S. 871, 889 (1990)). Given petitioners' allegation that the amount of available water will be reduced and that they will be adversely affected thereby, it is easy to presume specific facts under which petitioners will be injured—for example, the Bureau's distribution of the reduction pro rata among its customers. The complaint alleges the requisite injury in fact.

The Government also contests compliance with the second and third Article III standing requirements, contending that any injury suffered by petitioners is neither "fairly traceable" to the Service's Biological Opinion, nor "redressable" by a favorable judicial ruling, because the "action agency" (the Bureau) retains ultimate responsibility for determining whether and how a proposed action shall go forward. See 50 CFR § 402.15(a) (1995) ("Following the issuance of a biological opinion, the Federal agency shall determine whether and in what manner to proceed with the action in light of its section 7 obligations and the Service's biological opinion"). "If petitioners have suffered injury," the Government contends, "the proximate cause of their harm is an (as yet unidentified) decision by the Bureau regarding the volume of water allocated to petitioners, not the biological opinion itself." Brief for Respondents 22. This wrongly equates injury "fairly traceable" to the defendant with injury as to

which the defendant's actions are the very last step in the chain of causation. While, as we have said, it does not suffice if the injury complained of is "'th[e] result [of] the *independent* action of some third party not before the court,'" *Defenders of Wildlife, supra,* at 560–561 (emphasis added) (quoting *Simon* v. *Eastern Ky. Welfare Rights Organization,* 426 U. S. 26, 41–42 (1976)), that does not exclude injury produced by determinative or coercive effect upon the action of someone else.

By the Government's own account, while the Service's Biological Opinion theoretically serves an "advisory function," 51 Fed. Reg. 19928 (1986), in reality it has a powerful coercive effect on the action agency:

> "The statutory scheme ... presupposes that the biological opinion will play a central role in the action agency's decisionmaking process, and that it will typically be based on an administrative record that is fully adequate for the action agency's decision insofar as ESA issues are concerned. . . . [A] federal agency that chooses to deviate from the recommendations contained in a biological opinion bears the burden of 'articulat[ing] in its administrative record its reasons for disagreeing with the conclusions of a biological opinion.' 51 Fed. Reg. 19,956 (1986). In the government's experience, action agencies very rarely choose to engage in conduct that the Service has concluded is likely to jeopardize the continued existence of a listed species." Brief for Respondents 20–21.

What this concession omits to say, moreover, is that the action agency must not only articulate its reasons for disagreement (which ordinarily requires species and habitat investigations that are not within the action agency's expertise), but that it runs a substantial risk if its (inexpert) reasons turn out to be wrong. A Biological Opinion of the sort rendered here alters the legal regime to which the action agency is subject. When it "offers reasonable and prudent alterna-

tives" to the proposed action, a Biological Opinion must include a so-called "Incidental Take Statement"—a written statement specifying, among other things, those "measures that the [Service] considers necessary or appropriate to minimize [the action's impact on the affected species]" and the "terms and conditions . . . that must be complied with by the Federal agency . . . to implement [such] measures." 16 U. S. C. § 1536(b)(4). Any taking that is in compliance with these terms and conditions "shall not be considered to be a prohibited taking of the species concerned." § 1536(o)(2). Thus, the Biological Opinion's Incidental Take Statement constitutes a permit authorizing the action agency to "take" the endangered or threatened species so long as it respects the Service's "terms and conditions." The action agency is technically free to disregard the Biological Opinion and proceed with its proposed action, but it does so at its own peril (and that of its employees), for "any person" who knowingly "takes" an endangered or threatened species is subject to substantial civil and criminal penalties, including imprisonment. See §§ 1540(a) and (b) (authorizing civil fines of up to $25,000 per violation and criminal penalties of up to $50,000 and imprisonment for one year); see also *Babbitt* v. *Sweet Home Chapter, Communities for Great Ore.*, 515 U. S. 687, 708 (1995) (upholding interpretation of the term "take" to include significant habitat degradation).

The Service itself is, to put it mildly, keenly aware of the virtually determinative effect of its biological opinions. The Incidental Take Statement at issue in the present case begins by instructing the reader that any taking of a listed species is prohibited unless "such taking is in compliance with this incidental take statement," and warning that "[t]he measures described below are nondiscretionary, and must be taken by [the Bureau]." App. 92–93. Given all of this, and given petitioners' allegation that the Bureau had, until issuance of the Biological Opinion, operated the Klamath Project in the same manner throughout the 20th century, it is not

difficult to conclude that petitioners have met their burden—which is relatively modest at this stage of the litigation—of alleging that their injury is "fairly traceable" to the Service's Biological Opinion and that it will "likely" be redressed—*i. e.*, the Bureau will not impose such water level restrictions—if the Biological Opinion is set aside.

## B

Next, the Government contends that the ESA's citizen-suit provision does not authorize judicial review of petitioners' claims. The relevant portions of that provision provide that

"any person may commence a civil suit on his own behalf—

"(A) to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof; or

.         .         .         .         .

"(C) against the Secretary [of Commerce or the Interior] where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary." 16 U. S. C. § 1540(g)(1).

The Government argues that judicial review is not available under subsection (A) because the Secretary is not "in violation" of the ESA, and under subsection (C) because the Secretary has not failed to perform any nondiscretionary duty under § 1533.

### 1

Turning first to subsection (C): that it covers only violations of § 1533 is clear and unambiguous. Petitioners' first and second claims, which assert that the Secretary has violated § 1536, are obviously not reviewable under this provision. However, as described above, the third claim alleges

that the Biological Opinion implicitly determines critical habitat without complying with the mandate of § 1533(b)(2) that the Secretary "tak[e] into consideration the economic impact, and any other relevant impact, of specifying any particular area as critical habitat." This claim does come within subsection (C).

The Government seeks to avoid this result by appealing to the limitation in subsection (C) that the duty sought to be enforced not be "discretionary with the Secretary." But the terms of § 1533(b)(2) are plainly those of obligation rather than discretion: "The Secretary *shall* designate critical habitat, and make revisions thereto, . . . on the basis of the best scientific data available and after taking into consideration the economic impact, and any other relevant impact, of specifying any particular area as critical habitat." (Emphasis added.) It is true that this is followed by the statement that, except where extinction of the species is at issue, "[t]he Secretary *may* exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat." *Ibid.* (emphasis added). However, the fact that the Secretary's ultimate decision is reviewable only for abuse of discretion does not alter the categorical *requirement* that, in arriving at his decision, he "tak[e] into consideration the economic impact, and any other relevant impact," and use "the best scientific data available." *Ibid.* It is rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decisionmaking. See *SEC v. Chenery Corp.*, 318 U. S. 80, 94–95 (1943). Since it is the omission of these required procedures that petitioners complain of, their § 1533 claim is reviewable under § 1540(g)(1)(C).

2

Having concluded that petitioners' § 1536 claims are not reviewable under subsection (C), we are left with the ques-

tion whether they are reviewable under subsection (A), which authorizes injunctive actions against any person "who is alleged to be in violation" of the ESA or its implementing regulations. The Government contends that the Secretary's conduct in implementing or enforcing the ESA is not a "violation" of the ESA within the meaning of this provision. In its view, § 1540(g)(1)(A) is a means by which private parties may enforce the substantive provisions of the ESA against regulated parties—both private entities and Government agencies—but is not an alternative avenue for judicial review of the Secretary's implementation of the statute. We agree.

The opposite contention is simply incompatible with the existence of § 1540(g)(1)(C), which expressly authorizes suit against the Secretary, but only to compel him to perform a nondiscretionary duty under § 1533. That provision would be superfluous—and, worse still, its careful limitation to § 1533 would be nullified—if § 1540(g)(1)(A) permitted suit against the Secretary for *any* "violation" of the ESA. It is the "'cardinal principle of statutory construction' . . . [that] [i]t is our duty 'to give effect, if possible, to every clause and word of a statute' . . . rather than to emasculate an entire section." *United States* v. *Menasche,* 348 U. S. 528, 538 (1955) (quoting *NLRB* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1, 30 (1937), and *Montclair* v. *Ramsdell,* 107 U. S. 147, 152 (1883)). Application of that principle here clearly requires us to conclude that the term "violation" does not include the Secretary's failure to perform his duties as administrator of the ESA.

Moreover, the ESA uses the term "violation" elsewhere in contexts in which it is most unlikely to refer to failure by the Secretary or other federal officers and employees to perform their duties in administering the ESA. Section 1540(a), for example, authorizes the Secretary to impose substantial civil penalties on "[a]ny person who knowingly violates . . . any provision of [the ESA]," and entrusts the Secretary with the power to "remi[t] or mitigat[e]" any such penalty. We know

of no precedent for applying such a provision against those who administer (as opposed to those who are regulated by) a substantive law. Nor do we think it likely that the statute meant to subject the Secretary and his officers and employees to criminal liability under § 1540(b), which makes it a crime for "[a]ny person [to] knowingly violat[e] any provision of [the ESA]," or that § 1540(e)(3), which authorizes law enforcement personnel to "make arrests without a warrant for any violation of [the ESA]," was intended to authorize warrantless arrest of the Secretary or his delegates for "knowingly" failing to use the best scientific data available.

Finally, interpreting the term "violation" to include any errors on the part of the Secretary in administering the ESA would effect a wholesale abrogation of the APA's "final agency action" requirement. Any procedural default, even one that had not yet resulted in a final disposition of the matter at issue, would form the basis for a lawsuit. We are loathe to produce such an extraordinary regime without the clearest of statutory direction, which is hardly present here.

Viewed in the context of the entire statute, § 1540(g) (1)(A)'s reference to any "violation" of the ESA cannot be interpreted to include the Secretary's maladministration of the ESA. Petitioners' claims are not subject to judicial review under § 1540(g)(1)(A).

## IV

The foregoing analysis establishes that the principal statute invoked by petitioners, the ESA, does authorize review of their § 1533 claim, but does not support their claims based upon the Secretary's alleged failure to comply with § 1536. To complete our task, we must therefore inquire whether these § 1536 claims may nonetheless be brought under the Administrative Procedure Act, which authorizes a court to "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U. S. C. § 706.

## A

No one contends (and it would not be maintainable) that the causes of action against the Secretary set forth in the ESA's citizen-suit provision are exclusive, supplanting those provided by the APA. The APA, by its terms, provides a right to judicial review of all "final agency action for which there is no other adequate remedy in a court," § 704, and applies universally "except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law," § 701(a). Nothing in the ESA's citizen-suit provision expressly precludes review under the APA, nor do we detect anything in the statutory scheme suggesting a purpose to do so. And any contention that the relevant provision of 16 U. S. C. § 1536(a)(2) is discretionary would fly in the face of its text, which uses the imperative "shall."

In determining whether the petitioners have standing under the zone-of-interests test to bring their APA claims, we look not to the terms of the ESA's citizen-suit provision, but to the substantive provisions of the ESA, the alleged violations of which serve as the gravamen of the complaint. See *National Wildlife Federation*, 497 U. S., at 886. The classic formulation of the zone-of-interests test is set forth in *Data Processing*, 397 U. S., at 153: "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." The Court of Appeals concluded that this test was not met here, since petitioners are neither directly regulated by the ESA nor seek to vindicate its overarching purpose of species preservation. That conclusion was error.

Whether a plaintiff's interest is "arguably . . . protected . . . by the statute" within the meaning of the zone-of-interests test is to be determined not by reference to the overall purpose of the Act in question (here, species preservation), but by reference to the particular provision of law

upon which the plaintiff relies. It is difficult to understand how the Ninth Circuit could have failed to see this from our cases. In *Data Processing* itself, for example, we did not require that the plaintiffs' suit vindicate the overall purpose of the Bank Service Corporation Act of 1962, but found it sufficient that their commercial interest was sought to be protected by the anticompetition limitation contained in § 4 of the Act—the specific provision which they alleged had been violated. See *Data Processing, supra,* at 155–156. As we said with the utmost clarity in *National Wildlife Federation,* "the plaintiff must establish that the injury he complains of . . . falls within the 'zone of interests' sought to be protected *by the statutory provision whose violation forms the legal basis for his complaint.*" 497 U. S., at 883 (emphasis added). See also *Air Courier Conference* v. *Postal Workers,* 498 U. S. 517, 523–524 (1991) (same).

In the claims that we have found not to be covered by the ESA's citizen-suit provision, petitioners allege a violation of § 7 of the ESA, 16 U. S. C. § 1536, which requires, *inter alia,* that each agency "use the best scientific and commercial data available," § 1536(a)(2). Petitioners contend that the available scientific and commercial data show that the continued operation of the Klamath Project will not have a detrimental impact on the endangered suckers, that the imposition of minimum lake levels is not necessary to protect the fish, and that by issuing a Biological Opinion which makes unsubstantiated findings to the contrary the defendants have acted arbitrarily and in violation of § 1536(a)(2). The obvious purpose of the requirement that each agency "use the best scientific and commercial data available" is to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise. While this no doubt serves to advance the ESA's overall goal of species preservation, we think it readily apparent that another objective (if not indeed the primary one) is to avoid needless economic dislocation

produced by agency officials zealously but unintelligently pursuing their environmental objectives. That economic consequences are an explicit concern of the ESA is evidenced by § 1536(h), which provides exemption from § 1536(a)(2)'s no-jeopardy mandate where there are no reasonable and prudent alternatives to the agency action and the benefits of the agency action clearly outweigh the benefits of any alternatives. We believe the "best scientific and commercial data" provision is similarly intended, at least in part, to prevent uneconomic (because erroneous) jeopardy determinations. Petitioners' claim that they are victims of such a mistake is plainly within the zone of interests that the provision protects.

## B

The Government contends that petitioners may not obtain judicial review under the APA on the theory that the Biological Opinion does not constitute "final agency action," 5 U. S. C. § 704, because it does not conclusively determine the manner in which Klamath Project water will be allocated:

> "Whatever the practical likelihood that the [Bureau] would adopt the reasonable and prudent alternatives (including the higher lake levels) identified by the Service, the Bureau was not legally obligated to do so. Even if the Bureau decided to adopt the higher lake levels, moreover, nothing in the biological opinion would constrain the [Bureau's] discretion as to how the available water should be allocated among potential users." Brief for Respondents 33.

This confuses the question whether the Secretary's action is final with the separate question whether petitioners' harm is "fairly traceable" to the Secretary's action (a question we have already resolved against the Government, see Part III–A, *supra*). As a general matter, two conditions must be satisfied for agency action to be "final": First, the action must

mark the "consummation" of the agency's decisionmaking process, *Chicago & Southern Air Lines, Inc.* v. *Waterman S. S. Corp.*, 333 U. S. 103, 113 (1948)—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow," *Port of Boston Marine Terminal Assn.* v. *Rederiaktiebola-get Transatlantic*, 400 U. S. 62, 71 (1970). It is uncontested that the first requirement is met here; and the second is met because, as we have discussed above, the Biological Opinion and accompanying Incidental Take Statement alter the legal regime to which the action agency is subject, authorizing it to take the endangered species if (but only if) it complies with the prescribed conditions. In this crucial respect the present case is different from the cases upon which the Government relies, *Franklin* v. *Massachusetts*, 505 U. S. 788 (1992), and *Dalton* v. *Specter*, 511 U. S. 462 (1994). In the former case, the agency action in question was the Secretary of Commerce's presentation to the President of a report tabulating the results of the decennial census; our holding that this did not constitute "final agency action" was premised on the observation that the report carried "no direct consequences" and served "more like a tentative recommendation than a final and binding determination." 505 U. S., at 798. And in the latter case, the agency action in question was submission to the President of base closure recommendations by the Secretary of Defense and the Defense Base Closure and Realignment Commission; our holding that this was not "final agency action" followed from the fact that the recommendations were in no way binding on the President, who had absolute discretion to accept or reject them. 511 U. S., at 469–471. Unlike the reports in *Franklin* and *Dalton*, which were purely advisory and in no way affected the legal rights of the relevant actors, the Biological Opinion at issue here has direct and appreciable legal consequences.

\*    \*    \*

The Court of Appeals erred in affirming the District Court's dismissal of petitioners' claims for lack of jurisdiction. Petitioners' complaint alleges facts sufficient to meet the requirements of Article III standing, and none of their ESA claims is precluded by the zone-of-interests test. Petitioners' § 1533 claim is reviewable under the ESA's citizen-suit provision, and petitioners' remaining claims are reviewable under the APA.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*