In re APPLIED PAGING
TECHNOLOGIES,
INC., Debtor.

Steven Gessman, and Robert
Gessman, Appellants,

v.

United States of America, Appellee.

Civ.A. Nos. 99–5379(AMW),
96–24039(NLW).
Bankruptcy No. 96–24039(NLW).

United States District Court,
D. New Jersey.

June 26, 2000.

Frank Agostino, Susan M. Flynn, Calo, Agostino, Hackensack, NJ, for Appellants.

Charles M. Flesch, U.S. Department of Justice, Trial Attorney Tax Division, Washington, DC, Susan Cassell, Assistant U.S. Attorney, Newark, NJ, for Appellee.

### MEMORANDUM OPINION

WOLIN, District Judge.

This matter is opened before the Court upon the appeal of Robert and Steven Gessman from the decision of the United States Bankruptcy Court, dated February 3, 1999, denying their motion to compel an allocation of payments from the debtor's Chapter 7 estate to a tax obligation for which appellants are personally liable. The appeal has been decided upon the written submissions of the parties pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, the Court will affirm the decision of the Bankruptcy Court and the appeal will be dismissed.

### BACKGROUND

As will be discussed more fully below, the Court will affirm the Bankruptcy Court substantially for the reasons set forth in the opinion of the Bankruptcy Judge, the Honorable Novalyn L. Winfield. Familiarity with that opinion is assumed. The Court writes only to explain its additional reasons for upholding Judge Winfield's rulings.

The Gessmans were the principals of Applied Paging Technologies ("Applied Paging"). Applied Paging filed a chapter 11 petition in 1996. This was converted to a chapter 7 liquidation in November 1997 and a Trustee was appointed. Because tax obligations are priority claims, 15 U.S.C. § 507(a)(8), and because the existence of this dispute establishes that the taxing authorities received less than one hundred percent of their claim against the estate, the Court may presume that general unsecured creditors received nothing from the liquidation.

The federal tax, which is the relevant claim in this appeal, had two components. On one hand, the debtor owed general corporate taxes that were solely the obligation of the debtor's estate. On the other hand, the debtor owed "trust fund" taxes; money that should have been withheld from employee paychecks for individual income and social security taxes and held in trust for the United States. Under federal law, the Gessmans are personally liable for trust fund taxes that were not paid to the government. See 26 U.S.C. § 6672. This personal liability drives the issues presented by this appeal. Applied Paging was a reseller of telephone paging

services. As such, its primary asset was its customer base, represented to be approximately 2,200 active pagers. Because this asset would evaporate in the event the company stopped operating, pressure existed to sell the customer accounts quickly. Meanwhile, the chapter 7 Trustee operated Applied Paging as a going concern for a short time.

Publication notice and a quick canvas of industry participants in the relevant counties of northern New Jersey produced two interested parties. One was received from an entity known as David Woletz, Inc., which offered $60,000 for the accounts. The second, from Paging Management, Inc., ("PMI"), was more complicated. The PMI offer involved a restrictive covenant from the Gessmans, pursuant to which they would not solicit the transferred customers nor compete in the paging business for three years. If the Gessmans agreed to the three-year restrictive covenant, PMI would pay $55 per paging unit. Without the restrictive covenant, PMI would only pay $10 per unit.

Thus, with the restrictive covenant, the PMI's offer was clearly the best, yielding in excess of $110,000. Without the covenant, the PMI offer fell to $22,000. The Woletz offer required a one-year restrictive covenant limited to a particular geographic area, and it did not contain a discount mechanism purporting to assign a value to the covenant.

Judge Winfield held a hearing on December 19, 1997, regarding the sale. At that hearing, counsel for the Gessmans noted that some 81% of the value of the PMI deal was attributable to the Gessmans' restrictive covenant. Counsel requested that the Bankruptcy Court find as a fact that the restrictive covenant was not an asset of the estate. The Gessmans' attorney stated that this would allow the Trustee to designate that portion of the proceeds of the sale to the debtor's trust fund tax liability. Of course, this would have had the corollary effect of reducing the Gessmans' personal exposure.

The Bankruptcy Court refused to make the requested finding. Although counsel had stated that the Gessmans' agreement to the restrictive covenant was contingent on the Bankruptcy Court making a finding with regard to the nature of the proceeds, further negotiations ensued. Finally, on the record, the parties agreed that the Trustee and the Gessmans would enter into a consent order. The Trustee would acknowledge that, to the extent any amount of the sales proceeds were attributable to the restrictive covenant, those proceeds were voluntarily contributed to the estate by the Gessmans. As consideration for the covenant, the Trustee agreed that when payment was made to the IRS of the sales proceeds, the Trustee would designate that portion attributable to the restrictive covenant as going toward the trust fund tax obligation. The parties agreed, however, that the Trustee would have no further obligation with respect to the designation nor any duty to defend it.

On that basis, notwithstanding counsel's prior statement that a court ruling on the issue was a *sine qua non*, the Gessmans let the PMI deal go forward by agreeing to enter into the restrictive covenant. The agreement with PMI (the "Asset Purchase Agreement") was executed by the Trustee. It recited the terms of the restrictive covenant, but the Gessmans were not apparently parties to the agreement. Indeed, in the motion for approval of the sale, the Trustee verified that "there is no connection between the Debtor's principals and PMI nor are there any agreements or considerations which are not disclosed herein."

Subsequently, the Gessmans moved before the Bankruptcy Court on notice to the taxing authorities for an Order compelling the authorities to designate that portion of the sale proceeds attributable to the restrictive covenant to the trust fund taxes. The New Jersey Division of Taxation did not respond. The IRS opposed the mo-

tion, however, and the Bankruptcy Court denied it. This appeal followed.

## DISCUSSION

 The United States District Court sits as a court of appeals from the decision of a United States Bankruptcy Court. The District Court reviews a bankruptcy court's legal conclusions *de novo*. *United States v. Fegeley*, 118 F.3d 979, 982 (3d Cir.1997). However, a bankruptcy court's factual findings will only be set aside if they are clearly erroneous. *Id.; In re Sharon Steel Corp.*, 871 F.2d 1217, 1223 (1989). The District Court is limited to the factual record before the Bankruptcy Court, *Mellon Bank, N.A. v. Delaware & Hudson Ry.*, 129 B.R. 388, 396 (D.Del. 1991) (citing *In re Neis*, 723 F.2d 584, 589–90 (7th Cir.1983)), and a mere difference opinion regarding the resolution of a factual issue will not permit reversal under the clearly erroneous standard. *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

The Bankruptcy Court denied the Gessmans' motion on three, independent grounds. First, the Bankruptcy Court found that the Gessmans lacked standing to bring the motion in the first place. Second, the Bankruptcy Court found that the record lacked sufficient basis either to determine what if any portion of the sales proceeds were the Gessmans' personal property, or to find that the Trustee sold anything but the assets of the chapter 7 estate. Lastly, the Bankruptcy Court disagreed that it had the power to order the IRS to designate funds in a chapter 7 matter.

### 1. Standing

 The Bankruptcy Court found that the Gessmans lacked standing to bring their motion, because they were not in the "zone of interests" the bankruptcy code was intended to further. Judge Winfield was careful to note that her standing analysis was not of the Article III "Cases or Controversies" variety, but turned on pru-

dential standing considerations applied by the courts in bankruptcy cases.

The Bankruptcy Court found that the Gessmans' motion did not fall within the zone of interests to be protected by the bankruptcy statute such that they would have standing in bankruptcy cases. *See Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (setting forth "zone of interest" standing analysis). Congress has found that the "zone" of the bankruptcy statute includes the interests of protecting the estate and maximizing recovery of creditors. *In re Charter Co.*, 862 F.2d 1500, 1502 (11th Cir.1989). Because the ongoing interest of the estate is moot in a chapter 7 liquidation, the only remaining interest is the payment of creditors.

 The Gessmans' only response to this argument was that their motion was for the benefit of the creditors. This is plainly wrong. As the Bankruptcy Court noted, the only creditor affected by the motion was the IRS, and that creditor would have been harmed not benefitted by the motion. Any money allocated to the trust fund taxes would leave a corresponding shortfall in the debtor's general corporate tax liability while erasing the Gessmans as a secondary source for the trust fund taxes. Indeed, it is settled IRS policy that involuntary payments, including those received through a chapter 7 bankruptcy, are credited first to non-trust fund taxes, precisely because of the necessity of preserving the government's ability to be made whole. *See generally U.S. v. Pepperman*, 976 F.2d 123, 127, 131 (3d Cir. 1992).

In fact, the Gessmans' motion benefits no one but themselves. They are neither creditors nor debtors. The treatment of the sales proceeds does not maximize the benefit to the estate in any but the most formalistic sense. Consequently, their motion is not within the zone of interest the bankruptcy code is intended to protect. No other argument having been raised

regarding standing, the Court will affirm the Bankruptcy Court on this ground.

## 2. The Proceeds of the Sale Were Not the Property of the Gessmans.

 The Gessmans argue that their restrictive covenant represented their forbearance to use their own personal skills in the pager industry. They claim, therefore, that these skills were a personal asset they contributed to the estate by way of the restrictive covenant and that proceeds attributable to the covenant belong to them. This step in their argument is important to the Gessmans, because it is necessary to their claim that the proceeds be deemed to constitute a voluntary payment by them to the IRS. Voluntary payments, in contrast to involuntary payments through a chapter 7 proceeding, may be allocated to trust fund taxes by the payor. *See Pepperman*, 976 F.2d at 127. The United States contends that the restrictive covenant primarily dealt with goodwill associated with the customer accounts and that this goodwill was an asset of the estate.

The relevant section of the Asset Purchase Agreement actually reads as follows:

Individual principals of Applied [Paging] Technologies, Inc., their relatives and/or employees or agents for a period of thirty six (36) months from the Cut–Over Date, shall not solicit any of the customers whose paging units have been sold to PMI III. Individual principals of Applied [Paging] Technologies, Inc., their relatives and/or employees, shall not act as a paging carrier or reseller, dealer, or agent for any paging company other than PMI III for a period of thirty six (36) months from the Cut–Over Date.

(A16–A17.)

The Bankruptcy Court found a lack of evidence that the Trustee had transferred any interest belonging to the Gessmans in the sale to PMI. That Court cited the fact that the sale as noticed and approved contained no acknowledgment that it was a joint sale by Applied Paging and the Gessmans. Nor have the Gessmans asserted a formal claim to a portion of the proceeds in the bankruptcy proceeding. In the absence of any such documentation of the Gessmans' interest, the Bankruptcy Court was correctly unwilling to find that they owned a portion of the sale proceeds.

Moreover, as a factual matter, the Bankruptcy Court found that there was insufficient evidence to determine what, if any, the appropriate share allocated to the Gessmans should be or whether any such interest could be severed from the debtor's interest transferred in the Asset Purchase Agreement.

This Court agrees with reasoning of the Bankruptcy Court and also holds that its finding of insufficient evidence to allocate value to the Gessmans' covenant was not clearly erroneous. The record contains no evidence regarding what portion, if any, of the interests sold to PMI belonged to the Gessmans. The documents regarding the sale and the motion before the Bankruptcy Court for approval of the sale expressly stated that all of the benefits of the sale were accrue to the debtor's estate. Indeed, the Bankruptcy Court necessarily relied upon this representation in approving the sale.

Of course, the Gessmans put forward the Asset Purchase Agreement itself as establishing the value of the restrictive covenant. The Court is confident the Bankruptcy Court did not err in refusing to rely upon that amount. First, the Bankruptcy Court was correct in noting that not all of the Gessmans' forebearance in the restrictive covenant was connected to a promise not to use their personal skills in the industry for the stated three years. The restrictive covenant also concerns the Gessmans' agreement not to solicit the customer accounts away from PMI after the sale. These accounts were clearly the property of the debtor Applied Paging, and the Gessmans' covenant in this respect is, at best, no more than an under-

taking not to tortiously interfere with the sale.

Moreover, the circumstances of the sale are, at the least, suggestive that the parties 81%/19% allocation reflected in the difference in the purchase price need not be taken at face value. It will be recalled that David Woletz, Inc., offered a flat $60,000 for the same customer accounts. That offer involved a far more modest restrictive covenant and it assigned no explicit value to it. Plainly, Mr. Woletz thought far less of the value of the Gessmans' agreement to forebear from competition than PMI purported to do. Little significance can be attached to the fact that PMI agreed in the transaction to assign only $10 per pager if there were no restrictive covenant. PMI lost nothing by permitting the transaction to be structured in this manner.

The Gessmans' position is that they voluntarily contributed 81% of the value of the transaction and that this value generated over $100,000 of proceeds that they may allocate as they will. The question suggests itself: why did parties not structure the transaction as a joint sale accurately to reflect its true nature?

The obvious answer is that, if the sale had been a joint sale and the Gessmans received 81% of the proceeds directly, the PMI transaction would not have been the highest offer the Trustee received. On the contrary, the Woletz offer would have been the highest offer. But Woletz was apparently not willing to structure his bid based upon the Gessmans' restrictive covenant. By finding a party willing to assign a substantial portion of the value of the transaction to the Gessmans' restrictive covenant and by passing the proceeds through the Applied Paging estate, the Gessmans hoped drastically to reduce their tax liability at the expense of the government.

In short, the David Woletz, Inc., offer and the other circumstances of the transaction support the inference that the 81% value allocation in the Asset Purchase Agreement was not based upon any objective reality. For this additional reason the Bankruptcy Court was not clearly erroneous in finding that there was insufficient evidence to assign a definite value to the Gessmans' alleged contribution to the estate.

The Court believes that the entire transaction is better analyzed as follows, which analysis suggests yet another alternative ground upon which to uphold the Bankruptcy Court's decision. The Gessmans do not claim to be a party to the agreement with PMI. Rather, the Gessmans made their agreement with the Trustee. They characterize the restrictive covenant as a voluntary contribution to the estate. However, the Trustee agreed in return to make the Gessmans' requested designation of the proceeds to the trust fund taxes. The Trustee stated on the record that this undertaking was the consideration given for the covenant.

Significantly, the Trustee agreed only to make the designation; the Trustee pointedly declined to defend the designation at the expense of the estate. It might be thought, therefore, that this consideration was in the nature of a peppercorn. The Court believes that it was more. The Gessmans bought with their restrictive covenant the sporting chance that the Bankruptcy Court would accept their motion to allocate the proceeds. Although this gamble failed, the Gessmans still received value for their undertaking.

In any event, the restrictive covenant became the property of the estate. The Trustee assigned it to PMI along with the customer accounts. The relevant fact is that the transaction between the Trustee and PMI involved no asset of the Gessmans'. The Bankruptcy Court appreciated this fact when it observed that the Asset Purchase Agreement is completely silent regarding the transfer of any property belonging to them. Therefore, for the reasons stated by the Bankruptcy Court and for the further reasons stated above,

this Court affirms the Bankruptcy Court's refusal to find that any of the proceeds of the sale belonged to the Gessmans.

### 3. The Bankruptcy Court Lacked Power to Allocate the Payments.

 Finally, the relief sought in the Gessmans' motion is barred by *United States v. Pepperman*, 976 F.2d 123 (3d Cir.1992) In *Pepperman*, a chapter 7 trustee made payment to the IRS in the expectation that it would be applied to the trust fund tax liability of the debtor corporation and, thus, reduce the liability of the corporation's principal. The bankruptcy court found that this payment was voluntary and that the United States Supreme Court's opinion in *United States v. Energy Resources Co.*, 495 U.S. 545, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990), permitted the bankruptcy court to order the allocation of the payment to the trust fund taxes.

The Court of Appeals reversed. It first held that a payment to the IRS in a chapter 7 proceeding is involuntary as a matter of law. 976 F.2d at 127. The Circuit distinguished *Energy Resources* on the ground that the interests involved in a chapter 11, such as promoting the reorganization of the debtor, were not implicated in a chapter 7 case. Responding to the argument that the bankruptcy court properly exercised its equitable power under 11 U.S.C. § 105, the Court of Appeals held: "In our view, in the absence of a showing of need for a reorganization or similar purpose, a bankruptcy court is not free under the aegis of section 105 to direct the allocation of tax payments in contravention of the policy behind section 6672 and long-standing IRS procedure." 976 F.2d at 131.

1. Even if the law were otherwise, this Court harbors grave doubt that equity applied pursuant to Section 105 would permit the relief the Gessmans seek. Their company in liquidation and their employees' witholding taxes dissipated, the Gessmans apparently seek to use the bankruptcy code to avoid their responsibility. Of course, this result would

The Bankruptcy Court found that *Pepperman* foreclosed the relief the Gessmans seek, and this Court agrees[1]. Therefore, for this additional, independent reason, the Court will affirm the decision of the Bankruptcy Court.

### CONCLUSION

For the reasons set forth above, the Opinion and Order of the Bankruptcy Court denying the Gessmans' motion will be affirmed and the appeal will be dismissed.

come at a direct cost to the public fisc, because the IRS cannot pursue the employee taxpayers. *See* 26 U.S.C. § 31(a). Thus, even if the Bankruptcy Court were wrong on the law and its application of *Pepperman*, this Court would remand for consideration of these equitable principles.