ASSOCIATION OF AMERICAN
RAILROADS, Petitioner

v.

FEDERAL RAILROAD
ADMINISTRATION, et
al., Respondents.

No. 14–1207.

United States Court of Appeals,
District of Columbia Circuit.

July 10, 2015.

Thomas H. Dupree, Gibson, Dunn &
Crutcher LLP, Michael Jay Rush, Louis
Paul Warchot, Association of American
Railroads, Washington, DC, for Petitioner.

Christopher Scott Perry, Paul Maitland
Geier, Peter J. Plocki, U.S. Department of
Transportation, Washington, DC, for Respondents.

Before: GRIFFITH, SRINIVASAN,
and PILLARD, Circuit Judges.

## JUDGMENT

PER CURIAM.

This petition for review was considered
on the record from the Federal Railroad
Administration (FRA) and on the briefs of
the parties and oral argument of counsel.
The court has accorded the issues full consideration and has determined that they do
not warrant a published opinion. See FED.
R.APP. P. 36; D.C.CIR. R. 36(d). For the
reasons stated below, it is

ORDERED and ADJUDGED that the
petition for review be granted, the FRA
letter ruling of August 18, 2014, be vacated, and the case be remanded to the FRA
for further proceedings.

The Hours of Service laws dictate the
number of total hours certain railroad employees can work when they perform sensitive tasks requiring attention and expertise. H.R.Rep. No. 94–1166, at 13 (1976).
An employee performing such work is subject to a variety of safety-oriented restrictions. See 49 U.S.C. § 21104(a). If an
employee spends any time at all during a
shift performing covered work, then his
entire shift qualifies as time "on duty" for
purposes of the Hours of Service laws. Id.
§ 21104(b)(2); see also U.S. Dep't of
Transp., Fed. R.R. Admin., Technical Bulletin S–14–01 at 7 (2014), available at
www.fra.dot.gov/eLib/Document/14090.

As relevant here, Congress amended the
Hours of Service laws in 1976 to apply to
"signal employees," defined as "individuals
engaged in installing, repairing, or maintaining signal systems." 49 U.S.C.
§ 21101. Signal systems convey track and
safety information. Some are located
along the track's wayside, while cab signal
systems are integrated into the locomotive
cab. This case focuses on the Ultra Cab
II, an automated cab signal system.

The FRA has explained in guidance that
"the statutory language 'installing, repairing, or maintaining' refers to work that
could ... affect[ ] the proper and safe
functioning of signal systems," and that
requires "alertness, awareness, and expertise ... to be performed properly." Technical Bulletin S–14–01 at 5 (quoting 49
U.S.C. § 21101). The FRA has also specified that the "[i]nspecting and testing of a
system, subsystem, or safety-critical component ... is also covered service." Id.

The FRA requires at least daily tests to
confirm that railroad signal systems are
operating correctly. Testing a cab signal
system, including the Ultra Cab II system,
generally requires running an automated

self-diagnostic testing protocol incorporated into the cab signal system itself. Because the Ultra Cab II's automated self-test program requires less input from workers than manual testing protocols of the past, the Association of American Railroads (the Association) asked the FRA to exempt time spent running the Ultra Cab II self-test from the Hours of Service laws.

The FRA rejected this request in a Letter Ruling on August 18, 2014. The FRA explained that "the test is not as simple as [the Association] depicted it" and so should remain covered. This decision was based primarily on an investigation the FRA had conducted in 2011 in response to a similar request by the Southeastern Pennsylvania Transportation Authority. (SEPTA) to exempt the self-testing of its cab signal system. SEPTA had argued, like the Association does here, that its automated self-testing program required limited input from railroad workers and so did not require "alertness, awareness, or expertise." The FRA disagreed, concluding that SEPTA's self-test program actually required attentive expertise and so should be covered. In the Letter Ruling responding to the Association's request here, the FRA pointed to its 2011 SEPTA ruling and explained that the agency had "previously determined that proper performance of [the self-test] . . . is a covered service function" under the Hours of Service laws, and that the Association had not provided "an adequate basis for reinterpretation" of those laws. The Association timely petitioned for review.

We conclude that this action is sufficiently final for us to have jurisdiction to review it under 28 U.S.C. § 2342(7). Admittedly the FRA does not possess rulemaking authority to define the scope of the Hours of Service laws. *See Atchison, Topeka and Santa Fe Ry. v. Peña,* 44 F.3d 437, 441 (7th Cir.1994) (en banc).

For that reason the Letter Ruling is only an interpretive rule or a policy statement, and agency statements of that kind are generally non-reviewable because they are not final agency action. *See* HARRY T. ED-WARDS ET. AL, FEDERAL STANDARDS OF REVIEW 157, 162 (2d ed.2013). However, the Supreme Court has explained that we may nonetheless review agency determinations that "mark the consummation of the agency's decisionmaking process" and from which "legal consequences will flow." *Bennett v. Spear,* 520 U.S. 154, 178, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (internal quotation marks and citations omitted). Under the *Bennett* standard, the Letter Ruling qualifies as final agency action for the purpose of judicial review. It is clear that the Letter Ruling "mark[s] the consummation of the agency's decisionmaking process" because there is no further administrative process available to the Association. *Id.* The Letter Ruling also determines the "rights or obligations" of regulated railroads and "legal consequences will flow" from it. *Id.* At oral argument, the FRA and the Association both made clear that each regarded the Letter Ruling as final. The Association explained that its members would without question feel compelled to obey the Letter Ruling and organize their affairs accordingly. Moreover, the FRA itself has assured us that regulated railroads that refuse to conform to the Letter Ruling will be treated as acting in willful violation of the Hours of Service laws and thus subject to increased penalties in future FRA enforcement proceedings based on the Letter Ruling's authority alone. *See* Joint Rule 28(j) Letter; 49 C.F.R. Pt. 228 App. B (providing for increased penalties for willful violations of the Hours of Service laws). In other words, the Letter Ruling creates "a certain change in the legal obligations" of the Association's members and is therefore final. *Nat'l Ass'n of Home*

*Builders v. Norton,* 415 F.3d 8, 15 (D.C.Cir.2005). Because there is "no doubt that [the FRA] will refuse to" exempt time spent running cab signal system self-test programs in the future, the Letter Ruling making that position clear is final and we may review it. *Barrick Goldstrike Mines, Inc. v. Browner,* 215 F.3d 45, 47 (D.C.Cir.2000); *see also Peña,* 44 F.3d at 441 (agreeing that appellate courts may review an FRA policy statement).

On the merits, however, we must vacate the Letter Ruling because the FRA "has failed to provide a reasoned explanation" and "the record belies the agency's conclusion." *Petroleum Commc'ns, Inc. v. FCC,* 22 F.3d 1164, 1172 (D.C.Cir.1994). The Letter Ruling explained that the FRA, in its 2011 SEPTA ruling, had already determined that "performance of [Ultra Cab II] tests ... is a covered service function." But the record does not show that the FRA examined the Ultra Cab II system in 2011. The 2011 SEPTA ruling uses a different term to identify the cab signal system the FRA examined there. *See* J.A. 56 (referring to "the Harmon automatic train control ... system"). Admittedly, counsel for the FRA indicated at argument that he believed, though he was not positive, that both disputes involved the same system. Oral Arg. Rec. 36:35–37:02, 38:54–39:37. But we evaluate agency action based on the record. And the record does not support the FRA's determination.

The Letter Ruling also relied on facts about the 2011 SEPTA ruling that do not appear in the record. The FRA explained that it discovered in 2011 that the Ultra Cab II self-test program required employees to "check[ ]" the "calibration of the systems ... outside of the self-test procedure," a complicated task that justified covering the self-test under the Hours of Service laws. But the record of the 2011 SEPTA ruling does not reveal anything

about "check[ing]" the "calibration of the systems." Nor has the FRA explained where it found these critical details about the 2011 investigation. The facts on which the Letter Ruling relied do not appear in the record. Therefore we must vacate the Letter Ruling and remand for the FRA to explain itself.

The FRA may be able to provide an adequate justification on remand for the decision it reached here. If so, we can at that time consider the Association's other challenges to the FRA's action. But given the Letter Ruling's obvious defects we cannot evaluate the FRA's decision now for consistency with the FRA's past interpretations or the text of the statute. We therefore grant the Association's petition, vacate the Letter Ruling, and remand for further proceedings.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate herein until seven days after resolution of any timely petition for rehearing or rehearing en banc. *See* FED. R.APP. P. 41(b); D.C. CIR. R. 41.