**PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATION; Institute for Fisheries Resources; Oregon Natural Resources Council; Umpqua Watersheds, Inc.; Coast Range Association; and Headwaters, Plaintiffs,**

v.

**NATIONAL MARINE FISHERIES SERVICE, Defendant,**

and

**Douglas Timber Operators, Inc. and Northwest Forestry Association, Defendant–Intervenors.**

No. C99–67R.

United States District Court, W.D. Washington.

Sept. 30, 1999.

---

Patti A. Goldman, Earthjustice Legal Defense Fund, Seattle, Jan Hasselman, Earthjustice Legal Defense Fund, Seattle, Brian C. Kipnis, U.S. Attorney's Office, Seattle, WA, for plaintiffs.

Brian C. Kipnis, Janice M Schneider, U.S. Department of Justice, Environmental & Natural Resources, Washington, DC, Jean E. Williams, U.S. Department of Justice, Land and Natural Resources Division, Washington, DC, for defendant.

Mark C. Rutzick, Portland, OR, for defendant–intervenors.

## ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DISMISSAL AND GRANTING CROSS–MOTIONS TO STRIKE IN PART

ROTHSTEIN, District Judge.

THIS MATTER comes before the court on the parties' cross-motions for summary judgment, and cross-motions to strike evidence filed in support of summary judgment, and defendant-intervenors' motion for summary judgment and motion to dismiss.[1] The court has considered the

1. Defendant-intervenors move to dismiss on the grounds that the court lacks subject matter jurisdiction and that plaintiffs have failed to join indispensable parties. The court rejected these arguments in a previous suit between these parties, *Pacific Coast Federation of Fishermen's Associations, et al. v. National Marine Fisheries Service*, No. 97–775R (*PCFFA I*), and they are not repeated here. Defendant-intervenors also move to dismiss on the ground that the court lacks a complete administrative record. Defendant-intervenors, however, have submitted the documents they contend are necessary to complete the record by way of declaration.

pleadings and documents filed in support of and in opposition to the motions and the relevant administrative record. Being fully advised, the court grants plaintiffs' motion for summary judgment, denies defendants' motions for summary judgment and to dismiss and grants the cross-motions to strike in part.

## I. BACKGROUND [2]

Plaintiffs are six Oregon-based organizations representing the interests of commercial fishermen and/or environmental causes. They have sued the National Marine Fisheries Service (NMFS) under the Endangered Species Act (ESA), 16 U.S.C. § 1536. The State of Oregon, Douglas Timber Operators, Herbert Lumber and Superior Lumber have joined the suit as defendant-intervenors.[3] Plaintiffs challenge four biological opinions issued by NMFS on the impacts of 24 federal timber sales in the Umpqua River Basin on the Umpqua cutthroat trout and the Oregon coastal coho salmon, fish species that have been listed as threatened or endangered under the Endangered Species Act. Plaintiffs ask the court to vacate the four opinions.

In a previous suit between these parties, plaintiffs challenged a Programmatic Biological Opinion (BO)[4] NMFS issued on March 18, 1997. In the Programmatic Biological Opinion, NMFS concluded that the continued management of public land in the Umpqua River Basin in Oregon under the United States Forest Service's (USFS) existing Land and Resource Management Plans (LRMPs) and the Bureau of Land Management's (BLM) existing Resource Management Plans (RMPs) would not jeopardize the survival of the Umpqua cutthroat trout. In that suit, plaintiffs contended that NMFS failed to use the best available scientific information in reaching its "no jeopardy" conclusion as required by the ESA, that it did not consider enough evidence in reaching its "no jeopardy" conclusion, that the conclusion conflicted with evidence before the action agencies and that the Programmatic Biological Opinion authorized site-specific actions without adequate consultation as required by the ESA. Plaintiffs asked the court to invalidate the March 18, 1997 Programmatic Biological Opinion and order the government defendants to reconsult on the continued implementation of USFS and BLM's Umpqua River Basin management plans. Plaintiffs also sought an order prohibiting USFS and BLM from "tiering to" (relying on) the Programmatic Biological Opinion to authorize any site-specific projects or management actions that may affect the listed fish. A central contention in that suit was whether NMFS had ensured compliance with the Aquatic Conservation Strategy (ACS), a component of the Northwest Forest Plan. The Northwest Forest Plan adopted standards and guidelines for forest management within the range of the northern spotted owl. The ACS addresses the habitat needs of salmonids on federal lands within the range of the northern spotted owl.

The court upheld the Programmatic Biological Opinion. And it held that USFS and BLM could properly tier to the Programmatic Biological Opinion in their respective management plans. The court found that NMFS did not act arbitrarily or capriciously in assuming that the USFS and BLM would implement the LRMPs and RMPs in a manner consistent with the ACS. The court held, however, that NMFS

---

**2.** The procedural and factual background of this controversy are set out in the court's March 25, 1999, order granting plaintiffs' motion for a preliminary injunction and in the court's May 29, 1998, amended order granting defendants' motion for summary judgment in part. The court only recites here those facts necessary to understand its holding.

**3.** In discussing the defendants' substantive arguments, the court refers to the defendants collectively as "NMFS" unless otherwise indicated.

**4.** The parties also refer to the Programmatic Biological Opinion as the "Plan BO," "Northwest Forest Plan BO," or "NFP BO." For consistency the court uses "Programmatic Biological Opinion."

could not rationally reach a "no jeopardy" conclusion in reviewing the agencies' site-specific biological opinions without analyzing whether the proposed projects did, in fact, comply with the ACS. Thus, the court held that NMFS could properly assume on the programmatic level that the agencies' proposed actions would comply with the ACS, but found that it had failed to ensure or verify ACS compliance on the site-specific or project level.

Following the court's decision in *PCFFA I*, the government defendants consulted on 24 timber sales covered by the biological opinions at issue in this litigation. In November and December 1998, NMFS issued four biological opinions concluding that the proposed timber sales would not jeopardize coho or cutthroat survival and recovery.[5] AR 1 at 14, 1s–3s. In the instant suit, plaintiffs challenge NMFS's new biological opinions. They contend that the new opinions suffer from the same flaw in that they are inadequate to ensure or verify the action agencies' compliance with the ACS.

## II. DISCUSSION

### A. *Motions to strike*

Both sides have filed extra-record evidence in the form of declarations. Both sides move to strike the other sides' extra-record evidence.[6] Specifically, plaintiffs seek to strike portions of Michael P. Tehan's declaration and all of Daniel R. Kenney's declaration because they are either not proper extra-record submissions or because they are impermissible expert opinions. Defendant seeks to strike Christopher Frissell and Mark Powell's declarations on the same basis.

■■■ Extra-record evidence is admissible to show the agency has not considered all relevant factors and to explain technical matters:

> If the reviewing court finds it necessary to go outside the administrative record, it should consider evidence relative to the substantive merits of the agency action only for background information, ... or for the limited purposes of ascertaining whether the agency considered all the relevant factors or fully explicated its course of conduct or grounds of decision ... Consideration of the evidence to determine the correctness or wisdom of the agency's decision is not permitted, even if the court has also examined the administrative record.

*Asarco, Inc. v. United States Envtl. Protection Agency*, 616 F.2d 1153, 1158 (9th Cir.1980). The court will consider the challenged evidence only for background information and hereby grants the cross-motions to strike to the extent the challenged declarations contain opinion evidence or evidence pertaining to the correctness of the challenged agency action.

### B. *Summary judgment motions*

#### 1. *Standard of review*

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56. A biological opinion is a final agency action that may be set aside under the Administrative Procedure Act[7] if the court finds it is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." *Bennett v. Spear*, 520 U.S. 154, 174, 117 S.Ct. 1154, 137

---

**5.** Twelve of the timber sales at issue in *PCFFA I* are at issue here because they were submitted for reconsultation following the court's order: Little River DEMO, Final Curtain, Dream Weaver, Buck Fever, Sweet Pea, Buck Creek Commercial Thin, E-mile, Red Top Salvage II, Lower Conley, Foghorn Cleghorn Commercial Thin, Sugar Pine Density Management and Diamond Back. The remaining timber sales were proposed since the court's

order and have, therefore, not been reviewed by the court.

**6.** Plaintiffs move, in the alternative, for leave to file a surreply brief on the summary judgment motions. The court finds that the summary judgment motions have been adequately briefed and the motion is denied on that basis.

**7.** 5 U.S.C. § 706(2)(A).

L.Ed.2d 281 (1997). A biological opinion is arbitrary and capricious if the agency has "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). A biological opinion is also invalid if it does not employ the best available scientific information as required by 16 U.S.C. § 1536(a)(2). *Greenpeace Action v. Franklin,* 14 F.3d 1324 (9th Cir. 1992).

### 2. ACS consultation procedure

The ACS has nine stated objectives aimed at maintaining or restoring the salmonid's aquatic habitat. The objectives provide a framework for managing aquatic ecosystems. The objectives describe the attributes and distribution of aquatic ecosystems believed necessary to provide conditions for maintaining currently strong populations of fish and other aquatic and riparian dependent organisms and to allow for recovery of currently degraded ecosystems. *See* Reeves Decl. at 5, ¶ 9. The ACS has four essential features designed to accomplish the nine objectives: 1) establish riparian reserves (an allocation of land associated with riparian areas with special standards and guidelines that restrict management activities in those areas); 2) designate key watersheds (watersheds important to the at-risk fish stocks); 3) utilize watershed analysis procedures for evaluating biologic processes in specific watersheds; and 4) provide for watershed restoration. AR 21 at B–9.

As part of the Northwest Forest Plan consultation, the Programmatic Biological Opinion endorsed a streamlined consultation process. Under the streamlined consultation process, interagency teams meet to evaluate specific forest management activities. When USFS or BLM proposes to take an action that may affect a threatened or endangered species covered by the Programmatic Biological Opinion, a "Level 1" team (an interagency team that includes a NMFS biologist), conducts an analysis to determine whether the project is likely to adversely affect the species. The Level 1 team records information regarding a specific project using a "matrix of pathways and indicators" set forth in the Programmatic Biological Opinion and a checklist.

If the Level 1 team cannot reach unanimous agreement on a project's impacts and consistency with the ACS, the action is elevated to the Level 2 team, an interagency team of scientific professionals. The project can also be elevated to the Level 3 team to resolve differences. Once there is consensus on project effects and consistency with the ACS, the project is forwarded to NMFS for formal consultation if necessary. With the exception of the proposed Little River DEMO sale, which was the subject of the court's preliminary injunction, none of the other timber sales at issue in this litigation was elevated by the Level 1 team.

The matrix and checklists reflect information needed to implement and attain the ACS objectives. It is divided into "pathways," which indicate water quality, habitat access, habitat elements, flow/hydrology, channel conditions and dynamics and watershed conditions. The pathways are broken down into "indicators" addressing specific components of each habitat characteristic. The matrix provides three possible characterizations of the existing condition of each habitat indicator that correspond to a statement about the habitat condition: 1) poorly functioning, 2) at risk or 3) not properly functioning. For each habitat indicator, the checklist provides columns corresponding to the three characterizations. It also provides columns to indicate whether the proposed action will restore, maintain, or degrade the habitat condition for each indicator.

### 3. ACS compliance

In the earlier suit, there was evidence in the record, as evidenced by the matrixes

and checklists for the proposed sales, that the proposed sales would degrade the habitat conditions at the project or site-specific level. Many of the checklists, for example, documented poorly functioning or at-risk habitat conditions. Following the court's decision, the action agencies reinitiated consultation for twelve of the sales at issue in *PCFFA I* [8] in order to document ACS compliance and implementation and initiated consultation for the other sales before the court. Plaintiffs contend that during the reconsultation process, the agencies refocused their criteria for assessing ACS compliance in a manner that gave the appearance that ACS compliance was being achieved, rather than engaging in a meaningful analysis of ACS compliance at the project scale. By refocusing their criteria, plaintiffs argue, the action agencies masked or ignored evidence that the proposed timber sales would not "maintain or restore" habitat conditions, as mandated by the ACS.

 Plaintiffs advance a number of arguments: First, that NMFS backed away from ensuring ACS consistency at the project level and instead directed that ACS consistency and jeopardy be determined at the 5th field [9] watershed, which can span 20–200 square miles. Second, that few if any timber sales will produce measurable impacts on such a large scale. Third, that by determining ACS consistency on a 10–20 year frame, the agencies ignored the sales' near-term impacts on fish survival and recovery. Fourth, that the agencies ignored conditions on non-federal lands in assessing the cumulative watershed effects of additional logging. Fifth, that the agencies ignored watershed analysis and riparian reserve violations.[10]

8. *See* note 5, supra.

9. Aquatic ecosystems are described as fields. The size of watershed determines its category. Fifth field ranges from 20–200 square miles and are referred to as watersheds. Sixth field ranges from 2–50 square miles and are referred to as subwatersheds. Reeves Decl. at 3, ¶ 5, n. 1.

In *PCFFA I,* the court held that NMFS could properly assume in the Programmatic Biological Opinion that the action agencies' implementation of the ten LRMPs and RMPs at issue in a manner consistent with the ACS would not likely jeopardize the continued existence of the Umpqua cutthroat trout. *PCFFA I* at 24. At issue here is whether NMFS adequately evaluated the action agencies' compliance with the ACS in reaching its "no jeopardy" conclusion.

### a. Project scale degradation and short term impacts

#### i. scale of ACS measurement

It is undisputed that the proposed timber sales before the court will result in some site-specific degradation: NMFS's four biological opinions issued in November and December 1998 document degrading effects at the subwatershed scale on sediment, flows, substrate, disturbance history, pool quality, large woody debris, and riparian reserves. In evaluating the actions for ACS compliance, NMFS concluded that only actions that would adversely affect the environmental baseline over an entire watershed over a long period would be inconsistent with ACS objectives. AR 1s at 10–13; *see also* AR 1 at 11–13; AR 2s at 12–16; AR 3s at 14–21. Under this analysis, which looks at the long term net effect of all management actions at the watershed scale, NMFS concluded that although the proposed timber sales would cause degradation at the site level, they were not inconsistent with the ACS because the effects were short term and localized.

Plaintiffs challenge NMFS's long term/watershed scale approach. At the outset, they argue, NMFS's approach is

10. Plaintiffs also make several arguments that appear to overlap with issues already raised and ruled on in *PCFFA I.* To the extent plaintiffs seek to challenge elements of the Programmatic Biological Opinion that the court upheld, such as NMFS's reliance on FEMAT's habitat-based analysis, the court will not address those arguments.

entirely new and they suggest it was designed in response to the court's earlier summary judgment order. Substantively, they contend that focusing on so large a landscape masks each sales' impacts. They also argue that by focusing on the watershed level, NMFS has ensured that no project will ever result in a jeopardy finding because few if any projects will create sufficient degradation at the watershed level to be deemed inconsistent with the ACS. They argue that ACS consistency and implementation must be determined and measured at the site-specific or project level.

NMFS argues that determining ACS compliance on the watershed scale is proper. It argues that ACS compliance was never intended to be measured at the project scale. Rather, it is intended to measure cumulative degradation across the watershed. Under NMFS's approach, there would be no ACS violation until the culminated degradation caused by individual projects is measurable at the watershed level. NMFS argues that plaintiffs' project level approach wrongly equates evidence of project level degradation recorded in the matrixes and checklists with ACS noncompliance. This approach, it contends, has no support in the Northwest Forest Plan, the ACS, the Programmatic Biological Opinion, the scientific evidence or elsewhere. NMFS also challenges plaintiffs' assertion that it has employed an entirely new approach following *PCFFA I*.[11]

NMFS maintains that it is clear that the watershed scale is the appropriate scale for making consistency findings. In support of this interpretation it cites to the Northwest Forest Plan which states:

> The Aquatic Conservation Strategy was developed to restore and maintain the ecological health of watersheds and aquatic ecosystems contained within

them on public lands .... The approach seeks to prevent further degradations and restore habitat over broad landscapes as opposed to individual projects or small watersheds.

AR 16, p. B–9. NMFS argues that the focus on the "ecological health of watersheds" and prevention of further degradations "over broad landscapes" demonstrates that the proper emphasis in ACS compliance is the watershed scale. This argument is misplaced. NMFS is correct that the ACS seeks to prevent degradation at the landscape level. The section of the Northwest Forest Plan quoted above, however, merely states that it is no longer appropriate to evaluate ecosystem degradation and restoration on a project by project basis. Rather, it reflects a new approach adopted in the Northwest Forest Plan, which requires the government defendants to consider the health of aquatic habitats over entire watersheds. NMFS' reliance on this mandate, thus, begs the question of what level it is supposed to measure or verify ACS compliance to adequately protect the watershed.

The FEMAT report, which the court, at least implicitly, held in *PCFFA I* represents the best scientific information, is the scientific underpinning of the ACS. AR 15a. In its report, FEMAT stressed (and indeed this court held in its prior decision) that the ACS strategy must be implemented at all four spatial scales: regional, province (river basin), watershed, and site (or project). The Programmatic Biological Opinion, in reliance on FEMAT, also requires ACS compliance at these four spatial scales. Thus, not only must the ACS objectives be met at the watershed scale (as NMFS argues), each *project* must also be consistent with ACS objectives, i.e. it must maintain the existing condition or move it within the range of natural variability.[12]

**11.** NMFS does not, however, cite to documentation in the *PCFFA I* record that it employed a long term/watershed approach before the court issued that opinion.

**12.** The "range of variability" at the watershed or subwatershed scale is the distribution of conditions of smaller subwatersheds that support acceptable populations of anadromous salmonids and other aquatic and riparian dependent organisms. Reeves Decl. at 8, ¶ 15.

Notwithstanding the fact that ACS compliance is required at all four spatial scales, NMFS is correct that the Programmatic Biological Opinion does anticipate some harmful activities under the Northwest Forest Plan. BO at 26. NMFS is also correct that evidence in the checklists and matrixes that a project will result in some degradation does not, standing alone, constitute ACS noncompliance. NMFS, however, provides no basis for its shift to a broad watershed scale of analysis and away from the multi-scale approach contained in the Programmatic Biological Opinion.

### ii. short term effects

On reconsultation, the action agencies considered degradation over the long term (at least a decade). *See,* e.g. AR 1s at 10. Each biological opinion concludes that recorded degradation is inconsequential across the 5th field watershed over the long term. NMFS argues that a long term approach is fully consistent with the Programmatic Biological Opinion and should be upheld. It also argues (somewhat inconsistently) that it evaluates short term effects as well and the potential for these effects to cause jeopardy in the short term.

The Programmatic Biological Opinion mandates that "management actions that do not maintain the existing condition or lead to improved conditions in the long term would not 'meet' the intent of the Aquatic Conservation Strategy and, thus, should not be implemented." AR 14 at 39. The Programmatic Plan Biological Opinion also recognizes that individual projects can be consistent with the ACS "[n]otwithstanding the potential for minor, short term adverse effects." AR 14 at 39.

NMFS's stated reason for choosing a ten year time frame to assess ACS compliance is that ten years "is the minimum period stated when recovery would be seen ...." AR 58 at 2; AR 59 at 2. The plaintiffs complain that this ten year assessment is faulty because it relies too heavily on passive restoration (i.e. tree regrowth) and assumes that if more portions of the

watershed cross the ten year regrowth threshold than are being cut, the logging will not have long term impacts. Plaintiffs argue that NMFS ignored short term impacts even where the watershed analysis stressed the need to avoid short term degradation. And, they argue, by looking so far ahead to determine when clearcut forests will be fully recovered, the agencies are essentially assuming away the sales' adverse hydrologic effects.

The court agrees with plaintiffs that NMFS has failed to adequately assess the short term impacts of the timber sales and that it has failed to adequately explain its assumption that passive restoration will adequately mitigate the adverse impacts of logging. The problem with NMFS's approach, as plaintiffs point out, is that NMFS is analyzing the sales' effects based on predicted conditions ten years after the sale. Because more trees are predicted to grow back over ten years than are being cut in the sale, every sale under consultation could ultimately result in a "no jeopardy" analysis. The court further finds that in order to fully ensure the action agencies' compliance with the ACS, NMFS would have to assess the conditions immediately after the sale instead of relying on tree regrowth as passive mitigation to compensate for the logging. The court concludes that its failure to do so was arbitrary and capricious.

### b. Private land conditions

In the Roseburg BLM district, where most of the proposed sale sites are located, there is a checkerboard pattern of federal and non-federal land ownership. Plaintiffs contend NMFS ignored the conditions on non-federal lands in making its "no jeopardy" determination.

It is undisputed that conditions on non-federal lands in the range of the Umpqua cutthroat trout have contributed significantly to the degradation of the specie's habitat:

Within the range of the UR cutthroat trout (the Umpqua River Basin), ap-

proximately 47% of the land is Federally managed. The remaining 53% is made up of private, county, and State land consisting primarily of agricultural and forest land. Historically, agriculture, livestock grazing, forestry and other activities on non-Federal land in the Umpqua River Basin have contributed substantially to temperature and sediment problems in the Umpqua River Basin. Conditions on and activities within the non-Federal riparian areas along stream reaches downstream of the USFS and BLM land presently exert a greater influence on river temperatures and probably contribute more sediment to the habitat of UR cutthroat trout and other Pacific salmonids in the Umpqua River Basin than USFS and BLM land. Programmatic Biological Opinion, AR 14 at 41. In *PCFFA I,* plaintiffs challenged the Programmatic Biological Opinion on the ground that it did not take into account activity on non-federal land. The court rejected this argument, finding it "clear from the record that NMFS did consider the effects of the activities on non-federal lands in reaching its 'no jeopardy' conclusion." *PCFFA I* at 22. The court declines to address this issue further since it was resolved in the earlier litigation.

### c. Watershed analysis violations

Under the Northwest Forest Plan, USFS and BLM are directed to use the results of watershed analysis to determine whether each project is consistent with the ACS objectives. The finding must include a description of the existing condition, a description of the range of natural variability of the important physical and biological components of a given watershed, and how the proposed project or management action maintains the existing condition or moves it within the range of natural variability. Plaintiffs contend that although the agencies drew some information from the watershed analysis in the site-specific consultations, they did not incorporate the

watershed analysis recommendations or desired future conditions in the ACS consistency determination. NMFS contends that the site-specific biological opinions before the court adhere to the findings and recommendations in the watershed analysis relevant to the particular project.

As examples of the action agencies' failure to adhere to the watershed analysis, plaintiffs point to the Little River Watershed Analysis, which identifies the Upper Little River as a high priority for restoration and protection. AR 17 at Recs–14, 16–17. The Little River Demo sale,[13] they argue, collides with these recommendations by allowing logging in riparian reserves in the Willow Flats area and Upper Little River drainage. They contend, and NMFS does not persuasively dispute, that the biological opinion does not mention the watershed analysis recommendations or provide any rationale for concluding that the sale is consistent with ACS objectives. NMFS argues instead that to the extent there is a conflict between recommendations, the DEMO project is permissible because it "clearly falls within the research exception to harvest in riparian reserves because no significant risk to watershed values or to ACS objectives exists."[14] The court, however, rejected the argument that the sale clearly fell within the research exception in ruling on plaintiffs' preliminary injunction motion.

In response to plaintiffs' criticisms of other projects' failure to adhere to the relevant watershed analysis or recommendations (e.g. the E-mile timber sale's failure to mention slope stability and the Upper South Myrtle Harvest Plan's failure to adhere to watershed analysis), NMFS offers the somewhat conclusory (and circular) response that there is no evidence that any of the projects criticized by plaintiffs will jeopardize the continued existence of the listed species.

---

13. This is the sale the court preliminarily enjoined on March 25, 1999.

14. Defendant's memorandum in support of summary judgment at 25.

The court finds that in the challenged biological opinions, NMFS failed to use watershed analysis to determine whether the watersheds at issue are within the acceptable range of variability. There is no discussion of the watershed analyses' descriptions of desired future conditions or incorporation of the watershed analyses recommendations to attain those conditions. For these reasons, the court finds that NMFS has not fully or sufficiently incorporated watershed recommendations into its ACS analysis.

#### d. Riparian reserve violations

The ACS standards prohibit logging in riparian reserves with narrow exceptions for salvage logging and thinning where needed to accelerate the development of mature forests in riparian areas or to otherwise attain the ACS objectives. Plaintiffs contend that in the second round of timber sale consultations, NMFS has not insisted on strict compliance with the Northwest Forest Plan's riparian reserve standards, despite its heavy reliance on inviolate reserves to mitigate the sales' degrading effects. The Little River Demo sale, for example, would log designated riparian reserves. The applicable biological opinion, however, states that the sale falls within a research exception. The court rejected this research exception rationale when it granted plaintiffs' motion for a preliminary injunction.

Similarly, Sugar Pine Density Management will log a 35–40 foot radius around designated sugar pines in a Tier 1 Key Watershed, and in riparian reserves. NMFS acknowledged in the biological opinion that it was unclear whether this logging would promote attainment of any ACS objectives or meet an exception for timbering in a riparian reserve. AR 3s 12.

NMFS found that the Sugar Pine action was justified in order to increase the survival of individual sugar pines. In the Red Top Salvage II action BLM proposes to salvage approximately 132 acres of blown-down timber. Twenty-three of those acres are in a riparian reserve. NMFS found the action justified to reduce the potential for insect infestation and to reduce fuel loads and the associated risk of catastrophic fire. NMFS has also approved several sales that will log in riparian reserves as part of commercial thins or salvage logging, including three sales in Key Watersheds. Plaintiffs contend that many of these sales have riparian buffers as small as 20 feet.[15]

NMFS acknowledges that logging in riparian reserves violates the ACS standards unless it will accelerate the development of mature forests or otherwise attain the ACS objectives. AR 3s at 2. In nearly identical language for each sale in a riparian reserve, the biological opinions state that the thinning will have beneficial effects on the rate of tree growth and riparian reserve recovery, even though there is evidence in the record to the contrary. See AR 1s at 9; AR 3s at 12–14.[16]

Logging in riparian reserves is prohibited for salvage sales unless "watershed analysis determines that present and future coarse woody debris needs are met and other ACS objectives are not adversely affected." Northwest Forest Plan Standard TM–1. The problem with NMFS's explanation for allowing violations of ACS riparian reserve standards is that it has no real relation to the sales' aquatic impacts. It is approving projects that serve some non-aquatic function (i.e. reduction of insect infestation) in violation of ACS riparian standards although there is nothing in

---

**15.** NMFS contends that plaintiffs do not offer a citation to the record to support this figure. This is incorrect. In the site-specific biological opinions some sales have proposed "no-cut buffers" of as little as 20 feet. See AR 1s at 3.

**16.** The Red Top II biological opinion, for example, notes that the watershed analysis found that large woody debris is not well-distributed or abundant in this area, that the subwatersheds where the logging will occur are not properly functioning for large woody debris, and that the sale violates the riparian reserve logging standard. AR 3s at 11.

the record that demonstrates that those projects have an aquatic benefit. The court finds that, at a minimum, NMFS must require some relation between the benefits used to justify projects in riparian reserves and an aquatic function. By permitting violations of ACS riparian reserve standards where there is no evidence of a rational connection between the proposed action and the attainment of ACS objectives, NMFS acted arbitrarily and capriciously.

*4. Conclusion re: ACS compliance*

The court finds that NMFS is required by the Northwest Forest Plan and the Programmatic Biological Opinion to ensure ACS compliance at all four spatial scales. Its decision to measure ACS compliance only at the watershed level and its failure to evaluate ACS compliance at the project or site level, therefore, was arbitrary and capricious. The court further concludes that NMFS could not rationally conclude, based on the evidence before it, that evaluating only long term impacts of agency activities satisfied its mandate to ensure ACS compliance. Its failure, therefore, to evaluate the short term impacts, (i.e. impacts that would manifest in less than a ten year period) was also arbitrary and capricious. Finally, the court finds that NMFS has not fully incorporated watershed recommendations into its ACS analysis. Its failure to do so was arbitrary and capricious in light of the fact that the watershed analysis undoubtedly represents the best available scientific information available.

By employing a long term/watershed approach in making jeopardy determinations, NMFS has virtually guaranteed that no timber sale will ever be found to jeopardize the continued existence of the Oregon coastal coho or Umpqua River cutthroat trout. By failing to require the action agencies to rely on and adequately incorporate watershed analysis into their biological opinions, NMFS has allowed the agencies to ignore the best scientific information available. In light of the overwhelming evidence of the ongoing degradation to the habitat of the endangered aquatic species in the Umqua River Basin, the court finds that NMFS's approach is not rationally calculated to achieve the goals of the ACS. The court, therefore, finds that NMFS acted arbitrarily and capriciously in approving biological opinions that run counter to the evidence before it [17] and that fail to employ the best available scientific information as required by 16 U.S.C. § 1536(a)(2).[18]

### III. CONCLUSION

The court GRANTS plaintiffs' motion for summary judgment [docket 60–1]; DENIES defendants' motions for summary judgment and dismissal [docket 77–1, 81–1]; GRANTS the parties' cross-motions to strike [docket 88–1, 97–1]; and DISMISSES this action.

---

**17.** *See Bennett v. Spear,* 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281.

**18.** *See Greenpeace Action v. Franklin,* 14 F.3d 1324.