**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**August 27, 2003**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 03-40710

_____

SIERRA CLUB,

Plaintiff - Appellant,

v.

GALE NORTON, Secretary of the United States Department of Interior; UNITED
STATES NATIONAL PARK SERVICE; UNITED STATES FISH AND
WILDLIFE SERVICE,

Defendants - Appellees,

BNP PETROLEUM CORP, BNP Petroleum Corporation; COMMISSIONER OF
THE TEXAS GENERAL LAND OFFICE,

Intervenor Defendants -
Appellees.

_____

Appeal from the United States District Court
For the Southern District of Texas
(C-02-163)

_____

Before DAVIS, SMITH and DUHÉ, Circuit Judges.

PER CURIAM[*]:

This is an appeal form the district court's dismissal of Sierra Club's claims under the Endangered Species Act against the Secretary of the Department of the Interior, the United States National Park Service and the United States Fish and Wildlife Service. The Sierra Club alleged that the government failed to comply with Section 7 of the Endangered Species Act when it adopted an Oil and Gas Management Plan for the Padre Island National Seashore and granted BNP Petroleum Corporation a site-specific drilling permit for activities on the Seashore. For the reasons that follow, we affirm.

I.

The Sierra Club brought suit against the United States Department of the Interior and two of its agencies, the National Park Service (NPS) and the Fish and Wildlife Service (FWS), alleging that the NPS failed to follow the administrative procedures in the Endangered Species Act (ESA) before adopting an Oil and Gas Management Plan (OGM Plan) covering oil and gas operations on the Padre-Island National Seashore (Seashore). The Sierra Club also claimed that NPS violated the same ESA provisions when it approved site-specific operations for BNP's drilling

[*] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

activities at Lemon and Lemon Seed well sites without conducting formal consultation with the FWS. The Sierra Club sought injunctive and declaratory relief.

Congress created the Seashore in 1962 on Padre Island, a barrier island located off the coast of Texas. Valuable oil and gas reserves exist under the Seashore and the adjacent waters. Pursuant to the enabling legislation, Texas and the individual landowners retained the mineral rights and the right to enter the Seashore and make reasonable use of the surface subject to regulation by the Department of the Interior.

The Seashore is one of only two nesting grounds for the Kemp's ridley sea turtle, an endangered species under the ESA. The female turtles come onto the beach between April and July to lay their eggs in nests covered by sand. After incubating in the sand for about 50 days, the turtles hatch and return to the sea.

The United States Geological Survey (Survey) and the NPS established an incubation program to encourage the Kemp's ridleys to use the Seashore as a nesting site and to improve survival rates. Volunteers comb the beaches on ATV's looking for turtle tracks that lead to a nest so that the eggs may be removed to a nearby incubation facility. The record reflects that not all of the nests are located.

The baby turtles are then returned to the beach under controlled conditions to "imprint" and return to the sea. This imprinting allows the turtles to return to the same beach for breeding. From 1979 through 2001, 45 nests were confirmed on the Seashore. The largest number of nests, approximately 23, were located on the Seashore in 2002.

In March 2001, the NPS published an Oil and Gas Management Plan (OGM Plan) for the Seashore after developing a detailed environmental impact statement as required by the National Environmental Protection Act. This Plan sets forth the NPS's policy for managing the exploration, development and transportation of the minerals located beneath the Seashore. The OGM Plan specifies some areas as Sensitive Resource Areas which will be closed to drilling and operations. The OGM Plan summarizes all of the existing statutory and regulatory requirements for oil and gas operations on public lands. The OGM Plan also includes a list of operating stipulations and mitigation measures. The OGM Plan does not provide for granting final approval for any drilling activities. Before drilling operations may begin, an operator must obtain a site-specific drilling permit from the NPS which must comply with all statutes and regulations.

In November 2001, BNP Petroleum Corporation submitted a Plan of

Operation to the NPS to drill and produce the Lemon/Lemon Seed wells.[2]

Following the requirements of the National Environmental Policy Act, a draft environmental assessment was made available for public comment in April 2002. The environmental assessment was revised and made available for a second round of public comments in July 2002. In November 2002, the NPS issued a Finding of No Significant Impact for the Lemon/Lemon Seed wells. This satisfied the requirements of the National Environmental Protection Act.

To comply with the ESA, the NPS and the FWS engaged in discussions regarding the potential impacts of the project on the Kemp's ridleys. NPS drafted a biological assessment and circulated it to the FWS and the Survey for review. Following comments made by the FWS, NPS revised the biological assessment and circulated it again. FWS made additional comments and suggested refinements. NPS completed the biological assessment in July 2002. The biological assessment concluded that BNP's activities were not likely to adversely affect any endangered species and included numerous mitigation measures and conditions to protect the Kemp's ridleys.

As the district court recognized, beaches are considered public roadways

_____

[2] NPS granted BNP a site-specific permit to BNP to drill another well, the Dunn-Merdoc well, on the Seashore from March to October 2002.

under the Texas Open Beaches Act.  The record reflects that two and four-wheeled vehicles travel extensively on the Seashore.  This traffic obeys a 25 mph speed limit, but is otherwise mostly unrestricted.

BNP's operations require the use of eighteen-wheeled vehicles on the beach. The biological assessment suggested, and BNP has incorporated, several mitigating measures to reduce the risk that the vehicles will harm the Kemp's ridleys. Employees are required to undergo training to learn to detect and avoid nests.  Daily morning patrols canvass the beach before any trucks cross it.   BNP's trucks are required to "caravan whenever possible" and monitors ride in front of the eighteen-wheelers to spot for nests.  The trucks also obey a 15 mph speed limit, and all of the ruts left by the trucks must be back-filled. All lights at the drilling site are directed away from the beach to prevent the turtles from becoming disoriented.

The Sierra Club filed suit against the Secretary of the Department of the Interior, the NPS and the FWS seeking injunctive and declaratory relief under the ESA.  BNP and the Texas General Land Office intervened.   The district court held that it lacked subject matter jurisdiction over the Sierra Club's claims regarding the OGM Plan, and the NPS did not act arbitrarily in informally consulting the FWS before granting BNP site-specific well permits for the Lemon/ Lemon Seed wells.

The Sierra Club timely appealed, and this court has jurisdiction to review the district court's summary judgment ruling pursuant to 28 U.S.C. § 1291.

## II.

The Sierra Club first argues that the NPS violated Section 7 of the ESA by failing to consult with FWS and failing to prepare a biological opinion before adopting the OGM Plan for the Padre Island National Seashore. After reviewing the record, we agree with the district court that we do not have jurisdiction to review the OGM Plan.

The Sierra club argues that the ESA's citizen-suit provision, 16 U.S.C. § 1540(g)(1), expressly authorizes judicial review in this case. We agree with the district court that this argument is foreclosed by the Supreme Court's decision in Bennett v. Spear, 520 U.S. 154 (1997). Like the petitioners in Bennett, the Sierra Club is challenging the Secretary's failure to comply with a nondiscretionary duty imposed by 16 U.S.C. § 1536. The Supreme Court clearly held that the ESA does not provide jurisdiction for this claim.

The Sierra Club next argues that even if the ESA does not provide independent jurisdiction for this claim, the OGM Plan is subject to judicial review under the Administrative Procedure Act, "which authorizes a court to 'set aside

agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Bennett at 174 (citing 5 U.S.C. § 706). The APA limits judicial review to agency actions made reviewable by statute and "final agency actions." See 5 U.S.C. § 704. Final agency actions are actions that must (1) "mark the 'consummation of the agency's decisionmaking process" and (2) "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" Bennett at 178 (internal citations omitted). For this court to have jurisdiction, the "final agency action" must be "an identifiable action or event." Lujan v. National Wildlife Fed'n, 497 U.S. 871, 899 (1990).

After reviewing the OGM Plan, we are satisfied that the district court correctly held that the OGM Plan did not constitute final agency action subject to judicial review. As the district court recognized, the OGM Plan does completely close some Sensitive Resource Areas to drilling and exploration activities. However, the Plan appears to be nothing more than a general statement of the NPS's policy, a collection of the governing statutes and regulations that govern and affect drilling in the Seashore, and suggested mitigation measures whose purpose is to "[p]rovide[] pertinent information to oil and gas owners and operators that will facilitate operations planning and compliance with all applicable regulations." U.S.

DEP'T OF THE INTERIOR NAT'L PARK SERV., PADRE ISLAND NAT'L SEASHORE OIL AND GAS MANAGEMENT PLAN (2000), NPS Doc. #343, p. 1. The Plan is not the consummation of the agency's decision making process because it does not establish any rights or obligations. Before the NPS may allow any drilling on the Seashore, a complete environmental review is required for each site-specific permit.

Additionally, the Sierra Club's challenge to the OGM Plan is the type of programmatic review that this court held to be unreviewable under the APA in Sierra Club v. Peterson, 228 F.3d 559 (5th Cir. 2000). Although the Sierra Club may not challenge the OGM Plan as a whole because it is does not represent final agency action, Peterson clearly supports the Sierra Club's right to challenge individual drilling permits later granted by the NPS.

III.

The Sierra Club next argues that the NPS violated Section 7 of the ESA by granting BNP a drilling permit for the Lemon and Lemon Seed wells without conducting a formal consultation with the FWS.

Section 7 of the ESA provides:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency

action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

16 U.S.C. § 1536(a)(2).  The regulations promulgated under this statute provide for two types of consultation procedures between the Secretary and the consulting federal agency, formal and informal.  The first step in the consultation process is the preparation of a biological assessment by the consulting agency which includes an initial determination of whether any endangered or threatened species "may be present in the area of [] proposed action" and whether the species is "likely to be affected."   16 U.S.C. § 1536(c); 50 CFR § 402.12.  If listed species are present and likely to be affected by the proposed action, the consulting agency must prepare a formal biological opinion addressing a detailed discussion of the effects of the proposed action on the listed species and a recommendation of whether the proposed action is likely to "jeopardize" the species. 50 C.F.R. § 402.14(h).  The regulations include several exceptions to the preparation of a formal biological opinion.  Relevant to this case, a formal biological opinion is not required if:

. . . as a result of the preparation of a biological assessment under § 402.12 or as a result of informal consultation with the Service under § 402.13, the Federal agency determines, with the written concurrence of the Director, that the proposed action is not likely to adversely affect any listed species or critical habitat.

50 C.F.R. § 402.14(b)(1).  The regulations define informal consultation:

Informal consultation is an optional process that includes all discussions, correspondence, etc., between the Service and the Federal agency or the designated non-Federal representative, designed to assist the Federal agency in determining whether formal consultation or a conference is required. If during informal consultation it is determined by the Federal agency, with the written concurrence of the Service, that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary.

50 C.F.R. § 402.13(a).  During informal consultation, an agency may also suggest modifications to the proposed action to avoid the likelihood of adverse effects to a listed species. 50 C.F.R. § 402.13(b).

The Sierra Club argues that in this case, the NPS acted unreasonably in deciding not to conduct a formal consultation with the FWS.  The Sierra Club points to the environmental assessment as evidence that a formal biological opinion was necessary in this case to determine the likely affects of BNP's proposed drilling activities on the Kemp's ridley sea turtle.  The Sierra Club also argues that the NPS did not have enough data to determine that the project would not have a likely

adverse affect on the Kemp's ridleys.  The Sierra Club seeks to enjoin BNP's activities during the nesting season until a formal biological opinion is developed.

Although our review of the district court's summary judgment ruling is *de novo*, our review of the NPS's decision to consult informally with the FWS is limited to whether the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); see Sierra Club v. Yeutter, 926 F.2d 429, 439 (5th Cir. 1991).  A reviewing court must determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Id. (internal citation omitted).

We agree with the district court that the NPS's decision not to engage in a formal consultation with the FWS was not arbitrary or capricious.  The NPS clearly identified the possible effects of the project on the Kemp's ridley in its environmental assessment and compared those likely impacts with the likely impacts of taking no action.  The NPS considered the impact of BNP's use of as many as 20 eighteen wheeled trucks during the drilling period in cumulation with the existing beach traffic which averages more than 500,000 trips annually.  The NPS noted that there has not been a documented case of a Kemp's ridley being crushed by traffic in the more than 20 years that the beach has been open to traffic and concluded that

the risk is low when past nesting activity is taken into consideration. U.S. DEP'T OF THE INTERIOR NAT'L PARK SERV., BNP PETROLEUM CORP. LEMON/LEMON SEED UNIT WELLS NO. 1-1000S AND 1-1008S ENVIRONMENTAL ASSESSMENT 74-81 (2002), NPS DOC #612.

The NPS also sought the involvement of the FWS and the record reflects an extensive amount of correspondence between the two agencies. As a result of these discussions, the NPS required BNP to implement a long list of mitigation measures to further reduce or eliminate any possible risk to the Kemp's ridleys. When the record is viewed as a whole, we cannot say that the NPS acted unreasonably in granting BNP site-specific permits for the Lemon and Lemon Seed wells.

IV.

For the reasons stated above, we AFFIRM the Order of the district court dismissing the Sierra Club's suit.

AFFIRMED.