TALLMAN, Circuit Judge,
dissenting:
I respectfully dissent. Appellants — several California public school students, their parents, and two non-profit organizations, including the now-defunct California Association of Community Organizations for Reform Now (“California ACORN”) — lack Article III standing because their alleged injury cannot be redressed by a favorable decision from us. I do not disagree with the majority’s conclusion that the regulation’s phrase, “[demonstrates satisfactory progress toward full certification as prescribed by the State,” 34 C.F.R. § 200.56(a)(2)(ii)(A)(4), is broader than the statute’s phrase, “has obtained full State certification,” 20 U.S.C. § 7801(23). But striking down the federal regulation at issue will have no positive practical impact on Appellants’ alleged injury because that injury is caused by the actions of a third party not before us — the State of California. Because invalidating the challenged federal regulation will not redress Appellants’ alleged injury, I would hold they have no standing to challenge the regulation in the first, place. This appeal should be dismissed for that reason.
I
Appellants argue that the Secretary of Education’s (“Secretary’s”) regulation of the states, in this case California, has harmed them. Under § 702 of the Administrative Procedure Act (“APA”), “[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.” 5 U.S.C. § 702. “To establish standing to sue under the APA, appellants must first meet the ‘irreducible constitutional minimum of standing[which] contains three elements: (1) injury in fact; (2) causation; and (3) likelihood that a favorable decision will redress the injury.’” DBSI/TRI IV Ltd. P’ship v. United States, 465 F.3d 1031, 1038 (9th Cir.2006) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Ap *801 pellants, as the parties “invoking federal jurisdiction^] bear[] the burden of establishing these elements.” Lujan, 504 U.S. at 561, 112 S.Ct. 2130.
While Appellants may be able to establish an injury in fact, they can neither establish causation nor a likelihood that a favorable decision will redress their injury.
II
Appellants have struggled to define their injury in fact. The majority characterizes Appellants’ injury as a “poorer quality education” that results from a disproportionate number of interns being assigned to California public schools that serve minority and low-income students. Maj. Op. at 797. This characterization seemingly contains two injuries. One injury is a poorer quality education itself. Another injury is the disproportionate number of intern teachers hired in these schools. Of course, Appellants argue that the latter causes the former. It follows then, that what Appellants really want is quite understandable — a better quality education.
But as the author of the majority opinion once wrote, “The critical question is not what [a plaintiff] ‘really’ want[s].” William A. Fletcher, The Structure of Standing, 98 Yale L.J. 221, 242 (1988). Rather, as my colleague there argued, courts should “look[] to the underlying ‘relevant’ statute to determine whether the would-be plaintiff has standing.” Id. at 264-65; see also Int’l Primate Protection League v. Adm’rs of Tulane Educ. Fund, 500 U.S. 72, 77, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991) (citing the same article for the same proposition). Thus, the argument must be that because NCLB entitles Appellants to the same proportion of highly qualified teachers to non-highly qualified teachers as students in affluent areas, the deprivation of that entitlement constitutes their alleged real and immediate injury.
The majority nevertheless characterizes Appellants’ injury in fact by what they “really” want — an improvement in their “poorer quality education.” But it is entirely speculative to conclude that striking down the regulation at issue would redress that injury. As amicus Teach for America notes, its teachers were able to fill positions in low-income areas precisely because “schools in disadvantaged areas were far more likely to have had hiring difficulties than schools in other areas.” Brief for Amicus Curiae Teach for America, et al. at 27-28 (quoting Richard M. Ingersoll, Center for American Progress, Why Do HighrPoverty Schools Have Difficulty Staffing Their Classrooms with Qualified Teachers? 5 (Nov.2004)). Put simply, many “highly qualified teachers” would rather work in affluent area schools than low-income area schools. See Brian A. Jacob, The Challenges of Staffing Urban Schools with Effective Teachers, 17 Future of Children 1 (Spring 2007) (noting that 34.7% of central city schools had difficulty hiring a math teacher, compared with only 25.1% of suburban schools).
By removing the Teach for America teachers’ “highly qualified” label, Appellants hope to lower the number of Teach for America teachers legally allowed to fill vacant positions in low-income area schools. But were California to carry out Appellants’ desired result, Teach for America suggests that disadvantaged schools would not see an increase in the number of teachers with “full State certification” teaching in low-income schools, but rather an endemic increase in vacancies. Faced with a staggering number of vacancies, school districts would be forced to resort to emergency measures, such as hiring short-term or long-term substitute *802 teachers. See Brief of Amicus Curiae Teach for America at 29.
Some have argued that students taught inconsistently by substitute teachers do not receive the same quality education as students consistently taught by permanent teachers, regardless of either teacher’s certification status. See Charles T. Clotfelter, Helen F. Ladd & Jacob L. Vigdor, National Bureau of Economic Research Working Paper No. 13648, Are Teacher Absences Worth Worrying About in the U.S.? 26 (Nov.2007) (“students whose teachers miss more days for sickness score lower on state achievement tests”); Teacher Absences Hurting Learning, USA Today, Jan. 18, 2006 (citing University of Washington postdoctoral fellow Raegen Miller for the proposition that as few as ten teacher absences in a year cause significant loss in math achievement). Thus, what little information there is about the potential impact of the majority’s decision indicates that it would not redress the majority’s characterization of Appellants’ alleged injury — a “poorer quality education.”
In addition, were Appellants’ injury in fact defined as a “poorer quality education,” they would have difficulty proving that such an injury is “real and immediate, not conjectural or hypothetical.” City of Los Angeles v. Lyons, 461 U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (internal quotations omitted). It is speculative to conclude that all fully certified teachers provide a higher quality education than all teachers participating in alternative route programs. Compare Kati Haycock, Good Teaching Matters: How Well-Qualified Teachers Can Close the Gap 13 (1998) (noting that “[ejducation courses completed, advanced education degrees, scores on professional knowledge sections of licensing exams, even, interestingly, years of experience ... [do not] seem to have a clear relationship to student achievement”), and Thomas J. Kane, Jonah E. Rockoff & Douglas O. Staiger, Photo Finish: Certification Doesn’t Guarantee a Winner, Education Next 64 (Winter 2007) (noting that “a teacher’s certification status matters little for student learning”), with Linda Darling-Hammond, Access to Quality Teaching: An Analysis of Inequality in California’s Public Schools, 43 Santa Clara L.Rev. 1045, 1051 (2003) (noting that “[n]ational studies have ... found that differences in teachers’ qualifications — including teachers’ general ability, knowledge of subject matter, preparation for teaching, and certification status, which reflects aspects of all of these other indicators — show significant effects on student achievement measured at the state, district, school, and individual student levels”) (citation omitted).
Appellants have sued under the APA to enforce the letter of NCLB. In passing NCLB, Congress asked states to develop “plans” to “identify steps” that they will take to ensure that “poor and minority children are not taught at higher rates than other children by inexperienced, unqualified, or out-of-field teachers.” 20 U.S.C. § 6311(b)(8)(C). Appellants allege that the federal regulation at issue has injured their right to not be taught by inexperienced teachers at a higher rate than “other children.” Their alleged injury should therefore be characterized as a lower proportion of experienced to inexperienced teachers instructing them as opposed to those instructing students in affluent areas. It is this alleged injury — the lower proportion itself — that I would consider as Appellants’ “real and immediate” alleged injury under the relevant statute. Lyons, 461 U.S. at 102, 103 S.Ct. 1660.
The majority reasons that if it strikes down the Secretary’s definition of a “highly qualified” teacher, 34 C.F.R. *803 § 200.56(a)(2)(ii)(A)(4), as inconsistent with Congress’ definition of a “highly qualified” teacher, 20 U.S.C. § 7801(23), Appellants’ alleged injury will be redressed. I cannot agree.
Ill
Appellants’ alleged injury is caused by a “third party not before the court.” Lujan, 504 U.S. at 560, 112 S.Ct. 2130. If a plaintiff is “an object of the [challenged] action (or forgone action) ... there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.” Id. at 561-62, 112 S.Ct. 2130. “When, however, as in this case, a plaintiffs asserted injury arises from the government’s allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed.” Id. at 562, 112 S.Ct. 2130. As the Supreme Court has stated:
In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction — and perhaps on the response of others as well. The existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict, and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury. Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish.
Id. (internal quotations and citation omitted).
In passing NCLB, Congress defined a “highly qualified” teacher as a teacher with “full State certification.” 20 U.S.C. § 7801(23). However, NCLB left the definition of “full State certification” entirely to the states — all of which are third parties not before us. To date, California has not defined “full State certification.” What California has done is issue its own regulations interpreting and implementing NCLB. Under California Code of Regulations, title 5, §§ 6101 and 6110, “[a] teacher who meets NCLB requirements” is one who “holds at least a bachelor’s degree and is currently enrolled in an approved intern program for less than three years,” or has a credential and meets other applicable testing requirements. CaLCode Regs. tit. 5, §§ 6101(2), 6110(2). Thus, California considers teachers presently participating in alternative certification programs to be highly qualified for purposes of NCLB.
Appellants’ alleged injury is therefore caused by California’s credentialing scheme. But California is not — and seemingly could never be — a party to this suit. See Horne v. Flores, — U.S. - n. 6, 129 S.Ct. 2579, 2598 n. 6, 174 L.Ed.2d 406 (2009) (“NCLB does not provide a private right of action.... Thus, NCLB is enforceable only by the agency charged with administering it.”). As a result, Appellants’ injury “depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict.” Lujan, 504 U.S. at 562, 112 S.Ct. 2130.
Because Appellants cannot bring suit against California, they have challenged the Secretary’s regulation. To have Article III standing to do so, however, Appellants must prove that their injury is fairly *804 traceable to the challenged regulation. Lujan, 504 U.S. at 560, 112 S.Ct. 2130. Aside from timing, Appellants present no evidence that California inextricably relied on the Secretary’s now-stricken regulation — as opposed to NCLB itself — in adopting its regime.
Therefore, Appellants cannot prove that the Secretary’s regulation caused the injury they allege. Instead, Appellants’ injury is “the result of ... [California’s] independent action ... [which is] not before the court.” Bennett v. Spear, 520 U.S. 154, 169, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (internal quotations omitted). Because California could have classified non-eertified intern teachers as “highly qualified” even in the absence of the federal regulation, Appellants have not demonstrated that they have been injured by the Secretary’s action.
IV
The majority’s disposition will not redress Appellants’ injury. A plaintiff meets the redressability test if it is “likely” — not certain — “that the injury will be redressed by a favorable decision.” Lujan, 504 U.S. at 561, 112 S.Ct. 2130 (internal quotations omitted); Bonnichsen v. United States, 367 F.3d 864, 872 (9th Cir.2004). While “[pjlaintiffs need not demonstrate that there is a ‘guarantee’ that their injuries will be redressed by a favorable decision,” Graham v. Fed. Emergency Mgmt. Agency, 149 F.3d 997, 1003 (9th Cir.1998), a “purely speculative favorable outcome will not suffice,” Rubin v. City of Santa Monica, 308 F.3d 1008, 1020 (9th Cir.2002) (internal quotation omitted).
The majority does not strike down California’s regulation — the cause of Appellants’ alleged injury. Instead, the majority strikes down a federal regulation that is nowhere mentioned in the California regulation. For Appellants’ injury to be redressed, California' — a third party not before us — will have to do something, but Appellants have not met their burden to prove that California would be coerced into doing anything in response to the majority’s holding. Cf. Bennett, 520 U.S. at 169, 117 S.Ct. 1154.
Appellants argue that a declaration stating that the Secretary’s alternative route regulation is “unlawful and void,” would likely cause California to cease treating alternative route participants as highly qualified. Both parties agree that whether an alternative route participant holds “full State certification as a teacher (including certification obtained through alternative routes to certification)” is a matter of state law. Thus, redressability turns on whether, absent the regulation, California would continue to consider teachers participating in alternative routes fully certified. But because California is not a party to this suit, we have little reason — beyond speculation — to believe it will change its regulatory scheme in any way as a result of Appellants’ victory.
The majority argues that the current California regulations “piggyback” on 34 C.F.R. § 200.56(a)(2)(ii), and if that section is struck down, “California [will be] very likely out of compliance with NCLB” and will therefore be forced to amend its credentialing scheme. Maj. Op. at 798. I disagree. The very language of California Code of Regulations, title 5, §§ 6101 and 6110 indicates that a teacher who holds a bachelor’s degree and who is enrolled in an approved intern program “meets NCLB requirements,” not the requirements of the Secretary’s regulations. Even assuming that §§ 6101 and 6110 were enacted to conform to both 34 C.F.R. § 200.56 and NCLB itself, there is nothing in §§ 6101 and 6110 that ties their validity to that of § 200.56. The “Reference” section in the notes to §§ 6101 and 6110 includes a cita *805 tion to NCLB’s statutory definition of “highly qualified,” 20 U.S.C. § 7801(23), but does not reference the Secretary’s definition in § 200.56. Indeed, § 200.56 is not mentioned in either § 6101 or § 6110, even though these sections were enacted after § 200.56. Finally, the “Authority cited” for §§ 6101 and 6110 is California Education Code § 12001, which gives the State Board of Education authority to “adopt rules and regulations for the allocation of federal funds,” but nowhere requires it to conform these “rules and regulations” to federal regulations. Cal. Educ.Code § 12001.
Appellants argue that because California allegedly changed its laws to comply with NCLB and its implementing regulations once before, it will do so again if the Secretary’s implementing regulation is revoked. But Appellants fail to cite any other evidence indicating that revocation of the Secretary’s regulation would have a coercive effect upon California. It is not just that California could change its state law definition of “full credential” to include alternative route participants. California could instead decide to keep its regulatory scheme in its currently ambiguous state. The majority admits as much. See Maj. Op. at 799 (noting there is “no evidence indicating that, in the event the federal regulation is held invalid, California will change its credentialing law”). Even with the federal regulation stricken, the existing California regulations would continue to credit an intern as “[a] teacher who meets NCLB requirements.” CaLCode Regs. tit. 5, §§ 6101(2), 6110(2).
The majority also overestimates the coercive power that the Secretary has over California, citing 20 U.S.C. § 1234c for the proposition that the Secretary “may withhold funds or take other enforcement action if a state fails to comply substantially with NCLB’s requirements.” Maj. Op. at 790-91. Contrary to the majority’s conclusion, Congress has made it clear that the Secretary may not tie federal funding specifically to certification standards. See 20 U.S.C. § 7910(b) (“The Secretary is prohibited from withholding funds from any State educational agency or local educational agency if the State educational agency or local educational agency fails to adopt a specific method of teacher or paraprofessional certification.”); id. § 7910(a) (“[N]o funds available to the Department or otherwise available under this chapter may be used for any purpose relating to a mandatory nationwide test or certification of teachers or education paraprofessionals.”). This specific prohibition on withholding funds based on the “certification of teachers” must trump the Secretary’s general power to withhold funds for “failing to comply substantially” with NCLB. See Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (“[I]t is a commonplace of statutory construction that the specific governs the general.”).
The majority attempts to circumvent this argument by stating that the question in this case is not whether the Secretary has the authority to dictate how teachers are certified, but rather, “whether the Secretary has the authority to withhold funds when a State fails to take steps to ensure that students in minority and low-income schools are not taught disproportionately by teachers without ‘full State certification’ as the state then defines ‘full certification.’ ” Maj. Op. at 799. This is a distinction without a difference. Were the Secretary to withhold desperately needed funds from California based on the majority’s interpretation of California’s certification process, the Secretary would in effect be imposing on California a federal interpretation of California’s own law. Under 20 U.S.C. § 7910(b), the Secretary cannot use the power of the federal purse to compel California to adopt a given standard to *806 determine who is fully State certified, but that is precisely what the majority’s decision attempts to force the Secretary to do.
In enacting NCLB, Congress merely required the states to adopt a “plan” that describes
the specific steps the State educational agency will take to ensure that both schoolwide programs and targeted assistance schools provide instruction by highly qualified teachers as required by sections 6314(b)(1)(C) and 6315(c)(1)(E) of this title, including steps that the state educational agency will take to ensure that poor and minority children are not taught at higher rates than other children by inexperienced, unqualified, or out-of-field teachers, and the measures that the State educational agency will use to evaluate and publicly report the progress of the State educational agency with respect to such steps.
20 U.S.C. § 6311(b)(8)(C). Moreover, 34 C.F.R. § 200.57, the regulation relating to teacher quality, does not require states to force teachers to work at a particular school. Nor does it even require that a balance exist in practice. What § 200.57 does require is that states “establish annual measurable objectives” and describe the steps and strategies the state will use to ensure teacher parity. 34 C.F.R. § 200.57(a)(2). The regulation also requires school districts to develop a plan to ensure that
[tjhrough incentives for voluntary transfers, professional development, recruitment programs, or other effective strategies, minority students and students from low-income families are not taught at higher rates than other students by unqualified, out-of-field, or inexperienced teachers.
Id. § 200.57(b)(2).
These minimal requirements highlight why Appellants’ injuries are not redressable. The majority repeatedly assumes that the State of California can simply assign or redistribute highly qualified teachers. These teachers are human beings. They are not pawns on a chess board that can be redistributed at will. Even in the absence of the regulation the majority strikes down, there is no requirement that California reconsider any such teacher allocations, only that it “establish annual measurable objectives,” 34 C.F.R. § 200.57(a)(2), develop a plan with “incentives for voluntary transfers,” id. § 200.57(b)(2), and “report [on its] progress,” 20 U.S.C. § 6311(b)(8)(C).
In short, the majority may strike down a portion of 34 C.F.R. § 200.56, but its disposition cannot compel California to entice better teachers to work in low-income areas. There is simply no basis in the record to believe that California will adopt incentive programs to encourage the voluntary transfer of fully State certified teachers — whoever they may be — as the result of the majority’s disposition. Given California’s current budget woes, that result is speculative indeed. Even if California had the practical means to enact such incentive programs for each locally-controlled school district, the decision to do so lies squarely within the kind of “broad and legitimate discretion the courts cannot presume either to control or to predict,” Lujan, 504 U.S. at 562, 112 S.Ct. 2130, and as a result, Plaintiffs do not have standing.
The majority nevertheless holds that California is likely to change its current policies and attempt to redistribute its fully State certified teachers by creating new incentive programs out of fear of being labeled a “seofflaw” and that there is therefore a significant likelihood that Appellants’ injuries will be redressed. Maj. Op. at 799. But this argument again boils down to how “fully State certified” is defined — a question that has left us *807 grappling with California’s ambiguous certification scheme without the benefit of California’s input. Despite the fact that California is not a party to this suit and we are bereft of the State’s own interpretation of its certification scheme, the majority has proceeded to adopt a definition of “fully State certified” that excludes interns. While the majority’s analysis on the subject is thorough, I think it unlikely that California “would feel compelled to accede to the legal view of a ... court expressed in a case to which it was not a party.” Lujan, 504 U.S. at 571 n. 5, 112 S.Ct. 2130 (Scalia, J., concurring).
Accordingly, Appellants have failed to meet their burden of establishing redress-ability.
V
Appellants cannot establish the requirements of causation or redressability necessary to confer Article III standing under Ltijan. We should hold they have no standing and direct dismissal of the case.